ACCEPTED
14-15-00024-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
7/6/2015 5:12:55 PM
CHRISTOPHER PRINE
CLERK

No. 14-15-00024-CV

IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
7/6/2015 5:12:55 PM
CHRISTOPHER A. PRINE
Clerk

MICROSOFT CORPORATION,

Appellant/Cross-Appellee,

v.

MICHAEL MERCIECA,

Appellee/Cross-Appellant.

On Appeal from the 353rd District Court, Travis County, Texas
Trial Court Cause No. D-1-GN-11-00130
The Honorable Tim Sulak, Presiding

## APPELLANT'S REPLY BRIEF

BECK REDDEN LLP
  Russell S. Post
  State Bar No. 00797258
  rpost@beckredden.com
  Kate Skagerberg
  State Bar No. 24058578
  kskagerberg@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

BECK REDDEN LLP
  Eric J.R. Nichols
  State Bar No. 14994900
  enichols@beckredden.com
  Gretchen S. Sween
  State Bar No. 24041996
  gsween@beckredden.com
515 Congress Avenue, Suite 1900
Austin, TX 78701
(512) 708-1000
(512) 708-1002 (Fax)

*Counsel for Appellant/Cross-Appellee, Microsoft Corporation*

Oral Argument Requested

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ...................................................................................i

INDEX OF AUTHORITIES.............................................................................iv

INTRODUCTION...............................................................................................1

ARGUMENT IN REPLY .................................................................................4

I. MERCIECA PROVIDES NEITHER LAW NOR EVIDENCE TO SUPPORT A CONCLUSION THAT MICROSOFT RETALIATED AGAINST HIM BY COMPELLING HIS CONSTRUCTIVE DISCHARGE. ...................................................................................................4

    A. Mercieca Provides Neither Law Nor Evidence to Support the Jury's Constructive Discharge Finding. ...................4

        1. Mercieca has no law to support the constructive discharge finding. ...........................................................4

        2. Mercieca has no facts to support the constructive discharge finding..........................................8

        3. Mercieca's scattershot approach to proving constructive discharge is legally impermissible.............13

    B. Mercieca Has No Evidence of Good Faith Engagement in a Protected Activity. .......................................18

        1. Mercieca's first HR complaint does not evidence good-faith engagement in a TCHRA-protected activity. ..........................................19

        2. Mercieca's second HR complaint does not evidence good-faith engagement in a TCHRA-protected activity. ..........................................22

    C. Mercieca Has No Evidence of Actionable Retaliation.............24

        1. Mercieca has no evidence of causation. .........................24

i

2.  Mercieca has no cognizable theory, only impermissibly stacked inferences to support his so-called "secret anti-Mercieca campaign."....................26

II.  ALTERNATIVELY, MERCIECA'S DAMAGES EVIDENCE IS SO TAINTED THAT THE ONLY REMEDY IS TO REVERSE AND RENDER JUDGMENT FOR MICROSOFT. .....................................31

A.  The Back-Pay Award Is Unsustainable. ..................................32

B.  The Compensatory Damages Award Is Unsustainable. ...........32

C.  The Attorneys' Fee Award Is Unsustainable..........................37

CONCLUSION AND PRAYER FOR RELIEF ....................................................38

CERTIFICATE OF SERVICE....................................................................40

CERTIFICATE OF COMPLIANCE .............................................................41

APPENDIX*

Jury Charge/Verdict...................................................................TAB A

Findings of Fact and Conclusions of Law ............................... TAB C

Internal HR Submission styled "Formal Complaint of Michael Mercieca," dated April 19, 2010 (18RR:MSFT90)...............................TAB E

Employee Relations Investigations Intake Form, dated May 10, 2010 (18RR:MSFT108)........................................................................TAB F

Internal HR Submission styled "Supplementation," dated June 9, 2010 (18RR:MSFT121)........................................................................ TAB G

Plaintiff's Third Amended Petition (CRS499-519)..............................TAB H

Letter announcing Mercieca's resignation, dated February 22, 2012, effective April 2, 2012" (18RR:MSFT221) ..................................TAB I

2011 Performance Review for Michael J.B. Mercieca, dated September 8, 2011 (18RR:MSFT216) ..................................................... TAB J

Employee Relations Investigations Summary Memo, dated
October 4, 2010 (18RR:MSFT180).......................................................... TAB M

Email string from M. Mercieca to G. Houston, dated May 5, 2010
(19RR:MSFT297)................................................................................... TAB N

\* The Tabs included here are among those in the Appendix to the Appellant's Brief; for the Court's convenience, those cited in this brief are attached here using the same Tab numbers along with Tabs M & N, which contain additional material drawn from the record.

iii

# INDEX OF AUTHORITIES

**CASE**                                                                                           **PAGE(S)**

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and
    Research Corp.*,
    299 S.W.3d 106 (Tex. 2009) ...............................................................................26

*Azubuike v. Fiesta Mart, Inc.*,
    970 S.W.2d 60 (Tex. App.—Houston
    [14th Dist.] 1998, no pet.)..................................................................................23

*Bates v. Dallas Indep. Sch. Dist.*,
    952 S.W.2d 543 (Tex. App.—Dallas
    1997, writ denied) ...............................................................................................6

*Bennett v. Grant*,
    2015 WL 1324857 (Tex. App.—Austin
    Mar. 20, 2015, no pet.).....................................................................................35

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)...........................................................................................31

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006).............................................................................................1

*Carlton v. Houston Cmty. Coll.*,
    2012 WL 3628890 (Tex. App.—Houston
    [1st Dist.] Aug. 23, 2012, no pet.) (mem. op.) ..................................................5

*Chandler v. CSC Applied Techs., LLC*,
    376 S.W.3d 802 (Tex. App.—Houston
    [1st Dist.] 2012, pet. denied)..............................................15, 21, 24, 25, 31

*City of Keller v. Wilson*,
    168 S.W.3d 802 (Tex. 2005) .......................................................................30, 36

*City of Laredo v. Montano*,
    414 S.W.3d 731 (Tex. 2013) ...............................................................................37

*EEOC v. La. Office of Cmty. Servs.*,
    47 F.3d 1438 (5th Cir 1995) ................................................................................1

*El Apple I, Ltd. v. Olivas*,
  370 S.W.3d 757 (Tex. 2012) ..................................................37, 38

*Emeritus Corp. v. Blanco*,
  355 S.W.3d 270 (Tex. App.—El Paso
  2011, pet. denied)..................................................................7, 8

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998)..................................................................8

*Hancock v. Variyam*,
  400 S.W.3d 59 (Tex. 2013)......................................................35

*Harris-Childs v. Medco Health Solutions, Inc.*,
  169 F. App'x 913 (5th Cir. 2006) ..............................................19, 23

*Hensley v. Echerhart*,
  461 U.S. 424 (1983)..................................................................37

*Houston Unlimited, Inc. v Mel Acres Ranch*,
  443 S.W.3d 820 (Tex. 2014) ....................................................31

*Jefferson Cnty v. Davis*,
  2014 WL 4262184 (Tex. App.—Houston
  [14th Dist.] Aug. 28, 2014, pet. filed) (mem. op.)......................33

*Lozano v. Lozano*,
  52 S.W.3d 141 (Tex. 2001)......................................................26

*Marathon Corp. v. Pitzner*,
  106 S.W.3d 724 (Tex. 2003) ....................................................26, 30

*Mathis v. Lockwood*,
  166 S.W.3d 743 (Tex. 2005) ....................................................31

*Methodist Hosp. v. Zurich Am. Ins. Co.*,
  329 S.W.3d 510 (Tex. App.—Houston
  [14th Dist.] 2009, pet. denied) ................................................32

*Mission Consol. Indep. Sch. Dist. v. Garcia*,
  372 S.W.3d 629 (Tex. 2012) ....................................................9

*Passons v. Univ. of Tex. at Austin*,
   969 S.W.2d 560 (Tex. App—Austin
   1998, no pet.) .........................................................................................6

*Pegram v. Honeywell*,
   361 F.3d 272 (5th Cir. 2004) .................................................................18

*Ptomey v. Tex. Tech Univ.*,
   277 S.W.3d 487 (Tex. App.–Amarillo
   2009, pet. denied).................................................................................18

*San Antonio Water Sys. v. Nicholas*,
   -- S.W.3d --, 2015 WL 1873217
   (Tex. Apr. 24, 2015) .......................................................................18, 19

*Satterwhite v. City of Houston*,
   602 F. App'x 585 (5th Cir. 2015) (per curiam) ..................................8, 9

*Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*,
   435 S.W.2d 854 (Tex. 1968) .................................................................26

*Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*,
   979 S.W.2d 730 (Tex. App.—Houston
   [14th Dist.] 1998, no pet.)....................................................................33

*Soledad v. U.S. Dep't of Treasury*,
   304 F.3d 500 (5th Cir. 2002) .................................................................24

*T.O. Stanley Boot Co. v. Bank of El Paso*,
   847 S.W.2d 218 (Tex. 1992) .................................................................26

*Tiner v. Tex. Dep't of Transp.*,
   294 S.W.3d 390 (Tex. App.—Tyler
   2009, no pet.) ................................................................9, 10, 11, 12, 13

*United Nat'l Ins. Co. v. AMJ Invests., LLC*,
   447 S.W.3d 1 (Tex. App.—Houston
   [14th Dist.] 2014, pet. dism'd).............................................................38

*Univ. of Texas-Pan Am. v. Miller*,
   2013 WL 4818355 (Tex. App.—Austin
   Aug. 28, 2013, no pet.) (mem. op.)......................................................18

*Vaughan v. Hartman Mmgt.*,
   2010 WL 5514335 (Tex. App.—Houston
   [14th Dist.] Dec. 28, 2010, pet. denied) (mem. op.)..............................................4

*Wal–Mart Stores, Inc. v. Itz*,
   21 S.W.3d 456 (Tex. App.—Austin
   2000, pet. denied)...................................................................................................7

*Warrick v. Motiva Enter., L.L.C.*,
   2014 WL 7405645 (Tex. App.—Houston
   [14th Dist.] Dec. 30, 2014, no pet.) (mem. op.) ...........................................19, 21

*Winters v. Chubb & Son, Inc.*,
   132 S.W.3d 568 (Tex. App.—Houston
   [14th Dist.] 2004, no pet.)...................................................................................37

*Wright v. Wal-Mart Stores, Inc.*,
   73 S.W.3d 552 (Tex. App.—Houston
   [1st Dist.] 2002, no pet.) .....................................................................................26

*Zaffuto v. City of Hammond*,
   308 F.3d 485 (5th Cir. 2002) ...............................................................................24

## INTRODUCTION

State and federal law encourages employees to come forward in good faith to report instances of discrimination and sexual harassment they experience in the workplace. These profoundly important civil rights laws are not intended, however, to be vehicles for recovering enormous damages based on subjective distress about workplace communication problems or for "judicial second-guessing of employment decisions." *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir 1995) (citation omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (reminding that Title VII "does not set forth 'a general civility code for the American workplace.'") (quoting cases).

Mercieca's case rests solely on a subjective suspicion that a co-worker complained about him because, at some undefined time, for some unexplained reason, his entire management chain "conspired to launch their secret anti-Mercieca campaign," as he puts it, and used the co-worker as a pawn in their "secret" scheme. Appellee's Br. at 36. This theory—even if it had any factual basis, which it does not—does not correspond to a claim under the Texas Labor Code ("TCHRA"). Therefore, in response to Microsoft's appeal, Mercieca does not offer a coherent, linear narrative explaining how the evidence he adduced provides a legally sufficient basis to satisfy the elements of a retaliation/constructive discharge claim under Section 21.055 of the TCHRA. Instead, he does what he did at trial: masks the absence of relevant facts with a

1

scattershot recitation of his subjective take on various isolated incidents, some dating back a decade before he engaged in the claimed "protected activity," and some that date well after he filed suit—and even after he finally left his job with Microsoft voluntarily seven months later.[1]

In struggling to defend the jury's findings, Mercieca grossly misrepresents the actual substance of the hodgepodge of evidence adduced at trial. For instance:

- He insists that his performance "became an issue for the first time in his career at Microsoft" only after he complained about his managers on April 19, 2010. Appellee's Br. at 51. In fact, the evidence shows that his annual review for 2005—five years earlier—noted that his current "role was not going to work out as a career choice" and indicated that he "did not meet expectations." 18RR:MSFT7. Thereafter, his 2006 midyear review still noted "needs improvement" in multiple categories. 18RR:MSFT8.

- Similarly, he claims that he only got a poor review in September 2011 because Eddie O'Brien, a Microsoft vice president, issued an "edict" to rate him at the lowest performance level. Appellee's Br. at 15, 51. But Mercieca entirely ignores the uncontroverted evidence about how and why he was ranked as he was relative to his larger sales group by the person who actually prepared the review. *See* **TAB J**; 10RR20-29.

- Further, Mercieca asserts that, in "mid-2009 to early 2010," his managers "made unsolicited comments about Mercieca needing a job." Appellee's Br. at 27. The incidents to which he alludes happened well ***before*** he claims to have engaged in any protected activity and thus, as explained below, cannot be "retaliation" under the TCHRA. Moreover, no one ever told him that he "needed to find a new job," as Mercieca spins it. *Id*. He relies, for instance, on a joke O'Brien made in the summer of 2009 after Mercieca had performed with a band at a Microsoft event. Mercieca testified that, "[O'Brien] said that -- he said that if -- I could get my friend, Bono, from U2

---

[1] In a two-week trial, Mercieca testified for days about his subjective perception of isolated incidents spanning over a decade. 5RR92-268; 6RR220-278; 7RR6-277; 8RR5-221; 9RR6-67.

2

to give you a job." That Mercieca found it "strange" in 2009 that O'Brien teased Mercieca about joining one of the most popular bands in history is hardly evidence that Mercieca was constructively discharged in 2012. 8RR81-82.

- Additionally, to support the incorrect assertion that he was told to look for another job, Mercieca refers to announcements regarding positions *within* Microsoft, sent to him *before* April 19, 2010, that would have resulted in *promotions*. 18RR:MSFT39, 18RR:MSFT63. That he, who had initially worked for Microsoft in Australia and was from England, thought it "weird" that he was invited to apply for significant promotions to positions in New Zealand (on October 6, 2009) and in Europe (on February 11, 2010) is not evidence that he was constructively discharged in 2012.

- Equally inaccurate is his claim that, in a phone call on April 15, 2010, his direct supervisor "told Mercieca he needed to find a new job." Appellee's Br. at 27. The transcript of that call, which Mercieca secretly recorded, reveals that Mercieca spent over 40 minutes haranguing his supervisor, who hardly spoke. 11RR9-52. After he had reduced her to tears, he was the one who demanded: "Are you telling me to look for another job?," to which she answered, "No." 11RR30-31. Mercieca later told HR that she had threatened to fire him during this conversation, 7RR238-39, but that characterization was as untrue then as it is now.

- He also incorrectly asserts that a Microsoft HR director told his managers that they should "let it go" with respect to the co-worker's complaints about Mercieca because there was "nothing there." *See* Appellee's Br. at 51. To support this reputed "fact," he cites nothing but his own testimony— 8RR217—when he attempted to explain the basis for his view that a "conspiracy" had been launched against him; his testimony is, however, nothing more than rank speculation.

Ultimately, the most compelling "evidence" to which Mercieca's brief refers does not exist. The evidence actually adduced at trial does not satisfy the standard of legal sufficiency to support a finding of retaliatory constructive discharge, as a matter of law.

3

Mercieca's brief pays relatively little attention to the core issue of whether there was legally sufficient proof to support the jury's liability findings. This is because the record is bereft of evidence to support the findings of (1) constructive discharge, (2) good faith engagement in a protected activity, or (3) but-for causation; thus there are three distinct reasons for reversing and rendering a take-nothing judgment for Microsoft. Additionally, if the Court were to reach the multiple damages issues raised in the appeal and cross-appeal—which Microsoft respectfully suggests will be unnecessary—the damages evidence is so flawed that it amounts to no evidence at all, thus also warranting reversal and rendition.

## I. MERCIECA PROVIDES NEITHER LAW NOR EVIDENCE TO SUPPORT A CONCLUSION THAT MICROSOFT RETALIATED AGAINST HIM BY COMPELLING HIS CONSTRUCTIVE DISCHARGE.

### A. Mercieca Provides Neither Law Nor Evidence to Support the Jury's Constructive Discharge Finding.

#### 1. Mercieca has no law to support the constructive discharge finding.

Mercieca has no legal support for his position that the proof adduced at trial is sufficient to sustain the jury's finding that he was constructively discharged. In responding to Microsoft's legal sufficiency challenge, Mercieca instead leans heavily on a breach of contract case. Appellee's Br. at 25-26 (citing *Vaughan v. Hartman Mmgt.*, 2010 WL 5514335 (Tex. App.—Houston [14th Dist.] Dec. 28, 2010, pet. denied) (mem. op.)). The charge-error issue in *Vaughan* is irrelevant to

4

the issue of the quantum and quality of proof required to support a constructive discharge finding. Microsoft has not raised a charge-error issue in this appeal. The issue is whether Mercieca adduced a scintilla of evidence that satisfies the correct legal standard, which was accurately articulated by the trial court in the jury charge: did his employer make "conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." **TAB A**, Question 7.

None of the constructive discharge cases cited in Mercieca's brief supports the notion that (1) the evidence of workplace incidents Mercieca adduced represent conditions so "intolerable" as to reasonably compel a resignation or (2) a person can sue his employer and then resign months later, as he did, declaring his unilateral decision a retaliatory constructive discharge. For example, Mercieca cites *Carlton v. Houston Cmty. Coll.*, 2012 WL 3628890 (Tex. App.—Houston [1st Dist.] Aug. 23, 2012, no pet.) (mem. op.), which ***affirmed*** the trial court's decision to grant summary judgment for defendant on plaintiffs' retaliation claims. The *Carlton* plaintiffs had complained of: being passed over for promotions, "effective demotions and reduced responsibilities," an "unfair" investigation of "sexual harassment complaints," and other "hostile acts." *Id.* at \*12. "[A]s a matter of law," the allegations did "not rise to the level of an adverse employment action." *Id.* at \*13.

5

One of Mercieca's few reported TCHRA cases, *Passons v. Univ. of Tex. at Austin*, 969 S.W.2d 560, 564-65 (Tex. App—Austin 1998, no pet.), is also a charge-error case—again, not an issue that Microsoft has raised. In *Passons*, the court of appeals reversed based on the trial court's erroneous instruction that the plaintiff was required to show that the claimed discrimination was the "sole cause" or "*the basis*" for the reputed constructive discharge. *Id.* at 562 (emphasis retained). To determine whether the charge error was harmful, the court evaluated the record and concluded that "we cannot say that the cumulative effect of the conduct here could not support a jury finding of constructive discharge." *Id.* at 564. In reaching this conclusion, *Passons* notes evidence that, during a discrete period following an audit, the plaintiff was "more harshly punished than were her male counterparts for engaging in" the same misconduct, that she "was threatened with criminal and financial sanctions which she contends were unjustified and humiliating," and that "her supervisors belittled and demeaned her in front of her own staff, preventing her from effectively doing her job." *Id.* As discussed below, Mercieca adduced no comparable evidence. But even *Passons* recognized that "mere harassment, without more, is insufficient" to create an issue of material fact as to whether workplace conditions were objectively intolerable. *Id.* (citing *Bates v. Dallas Indep. Sch. Dist.*, 952 S.W.2d 543, 551 (Tex. App.—Dallas 1997, writ denied)).

By contrast, *Wal–Mart Stores, Inc. v. Itz* illustrates what can constitute legally sufficient evidence of constructive discharge. 21 S.W.3d 456 (Tex. App.—Austin 2000, pet. denied). In *Itz*, the court of appeals relied on evidence, in affirming judgment for the plaintiff, that the plaintiff's supervisor: repeatedly called her at home at night to ask about her relationship status; promised to put her up in an apartment if she broke up with her boyfriend; complimented her body; touched her inappropriately during a one-on-one back-room meeting; was "'always hovering around her and following her'"; gave her a "'very forceful'" "'body-to-body'" hug; pressed her to break up with her boyfriend; and after she reported this conduct, the employer did not respond to her at all. *Id.* at 462-65, 473-75. Mercieca did not adduce evidence of anything remotely akin to such conduct.

Surprisingly, Mercieca suggests that the jury was "entitled" to adopt his constructive discharge theory because his situation at Microsoft resembles the circumstances presented in *Emeritus Corp. v. Blanco*, 355 S.W.3d 270 (Tex. App.—El Paso 2011, pet. denied). Appellee's Br. at 30. *Emeritus* affirmed a constructive discharge claim brought by a whistleblower against an assisted living facility. Plaintiff Blanco, an administrator, was brought in to try to right a non-compliant facility. *Id.* at 272. She left her job after less than one year, thereafter filing suit. The evidence showed that, during her brief tenure, her employer failed to take action to remedy the following: "medications [were] not being properly documented or dispensed, proper medical attention [was] not being provided and

7

addressed, documentation to the residents charts [was] not being properly charted, communication to the doctors [was] not up to date[.]" *Id.* at 275. At one point, Blanco was called to an Alzheimer patient's room, where the patient was lying in bed with a mass protruding from her body. *Id.* at 273. Blanco had to track down a nurse in another facility because hers did not have a single nurse on staff; she then agonized as the patient "suffered from multiple issues while waiting for surgery." *Id.* at 274. Instead of responding to Blanco's requests for support, her employer "formally reprimanded" Blanco for permitting the facility to get "behind on billing." *Id.* She thereafter resigned, providing a detailed list of the concerns that had shaken her, with an entreaty "that you immediately address these concerns to ensure the safety and well being of the residents." *Id.* at 275.

No evidence in the record supports the notion that Mercieca experienced any comparable "conditions so intolerable" that his after-the-fact resignation can be deemed objectively reasonable. *Id.* at 281.

### 2. Mercieca has no facts to support the constructive discharge finding.

"'[I]solated incidents (unless extremely serious)' do not amount to actionable conduct" under either Title VII or the TCHRA. *Satterwhite v. City of Houston*, 602 F. App'x 585, 588 (5th Cir. 2015) (per curiam) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). TCHRA and Title VII claims "based on isolated incidents of non-extreme conduct" are routinely rejected "as

8

insufficient as a matter of law." *Id.* (citing cases and finding plaintiff failed to make a *prima facie* case of retaliation).[2] This is true under both federal and state law. *See, e.g.*, *Tiner v. Tex. Dep't of Transp.*, 294 S.W.3d 390, 395 (Tex. App.—Tyler 2009, no pet.) (finding that the plaintiff "did not show that the working conditions were unbearable, or that her employer was attempting to encourage her to resign.")

In *Tiner*, the court painstakingly considered the various incidents upon which the employee relied, in the light most favorable to the employee, and found those incidents, ***taken together***, did not amount to intolerable conditions as a matter of law. *Id.* at 394-97. *Tiner* merits considerable attention, because the isolated incidents at issue there are comparable to those upon which Mercieca relies. *See* Appellee's Br. at 27-29, 33-35.

First, Tiner insisted that her employer had mishandled a conflict with one of her co-workers. *Tiner*, 294 S.W.3d at 396. Likewise, Mercieca claims that his managers mishandled Tracy Rummel's internal complaint about his conduct, that

---

[2] In *Satterwhite*, the plaintiff was actually demoted and received a salary cut at the recommendation of the supervisor about whom the plaintiff had complained for allegedly saying "Heil Hitler" in a meeting. 602 F. App'x at 586. By contrast, Mercieca experienced no demotion or salary cut. *Satterwhite* and the precedent upon which it rests are persuasive. While Mercieca takes issue with Microsoft's reliance on federal cases, this critique is unfounded, as the Supreme Court of Texas has "consistently held that those analogous federal statutes and the cases interpreting them guide [its] reading of the TCHRA." *Mission Consol. Indep. Sch. Dist. v. Garcia,* 372 S.W.3d 629, 634 (Tex. 2012). Similarly, he asserts that Microsoft has no "on-point authority" to support the type of constructive discharge theory pursued here. Appellee's Br. at 19, 37. What is true is that neither party can point the Court to ***any*** case in which a constructive discharge claim has been maintained based on facts similar to those Mercieca adduced at trial.

9

he felt "marginalized" as a result, and that he had to file his own internal complaint against his management chain to learn what had happened to Rummel's complaint. TAB E; Appellee's Br. at 8, 9, 27. But the evidence shows that, after Rummel took her initial concerns to Mercieca's manager, to her own Microsoft manager, and to its HR department, Microsoft directed her to follow up with the contracting agent then employing her.[3] 18RR:MSFT48-50. Then, after Rummel became a full-time employee, she reached out again to Microsoft's HR department after experiencing what she saw as repercussions attributable to Mercieca. TAB F. While Mercieca threatened "legal escalation" unless he was told what Rummel had said about him during her confidential interview, Microsoft explained that doing so would violate company policy; however, Microsoft kept him fully informed as the investigation moved forward. 18RR:MSFT105; 18RR:MSFT126; 18RR:MSFT97; 18RR:MSFT115.

Second, Tiner insisted that her own complaints were ignored, despite evidence that the employer conducted an internal investigation, as Mercieca does. 294 S.W.3d at 396. The evidence here shows that Microsoft conducted an extensive investigation into both Rummel's and Mercieca's HR complaints. 18RR:MSFT260. Microsoft found insufficient evidence that its anti-discrimination

---

[3] As noted in the Appellant's brief, when Rummel first raised her concerns about Mercieca, she was employed as a contract employee through an agency and assigned to work with Mercieca on marketing issues for some of Mercieca's Microsoft "partner"/client accounts. Appellant's Br. at 6-7.

10

or anti-harassment policies had been violated in either instance, but reprimanded Aulds for failing to disclose that she had once had a brief romantic relationship with Mercieca, which they had both kept to themselves until 2010 when he produced evidence of photocopied love letters and voicemails from 2001-2002 during the ERIT investigation. 18RR:MSFT178; 18RR:MSFT189. Aulds was then removed from his management chain. 6RR83-85; 10RR68-69. No evidence supports Mercieca's insistence that she was "promoted" after the reprimand.[4] Likewise, no adverse employment action against Mercieca resulted from the internal investigation,[5] although the investigator found reason to suspects his motives. 18RR:MSFT178; 6RR75-79; **TAB M**.

Third, Tiner insisted that the co-worker with whom she had difficulty was "abusive, threatening, and unpleasant"—which Mercieca cannot reasonably claim—yet the court of appeals found the proffered evidence "no basis to conclude that [the employer] somehow created unendurable working conditions" or that this situation "caused Tiner to resign months later." 294 S.W.3d at 397. Similarly, Mercieca complains that Aulds was permitted to give him a review in 2010

---

[4] Appellee's Br. at 14 (citing testimony that contradicts the contention that she was "promoted," 6RR183-84; 11RR86-87, and Mercieca's subjective testimony that *he* nevertheless regarded the change as a promotion, 6RR218-19).

[5] As addressed in the Appellant's brief, poor performance evaluations, which an employee views as unfair, cannot form the basis of a constructive discharge claim. Appellant's Br. at 20-21, 30-31, 36-37. Regardless, Mercieca did not receive the poor review about which he complains until September 8, 2011, well after members of his management chain had changed and long after Rummel's HR complaint against him had been resolved. 18RR:MSFT216; **TAB J**.

11

(Appellee's Br. at 14, 28) while his HR complaint about her was pending. Yet (1) that review was largely positive; and (2) he did not resign until nearly two years later, well after Aulds had been removed from his management chain entirely and replaced by someone he liked and admired. 18RR:MSFT166; 7RR144; 18RR:MSF394; **TAB I**.

Fourth, Tiner insisted "that her supervisor got into an argument with her, ended her access to his email, and stopped talking to her"—yet the court of appeals held that this conduct did "not rise to the level of conduct designed to badger, harass, or humiliate Tiner," and found no basis to "conclude that the conduct was calculated to encourage her resignation." *Id.* at 395. Here Mercieca relies heavily on these kinds of communication issues, including his subjective interpretation of emails as unduly "scrutinizing" his work. *See, e.g.*, 18RR:MSFT57-60.

Fifth, Tiner complained about the tone of meetings with her supervisors, as Mercieca does. 294 S.W.3d at 396. Mercieca, however, points to nothing in any meeting that could be viewed objectively as "badgering, harassing, or humiliating or that [] was calculated to encourage [him] to resign." *Id.* Indeed, the meetings and phone calls with his colleagues that Mercieca secretly recorded show his managers talking with him about business concerns and trying to resolve communication issues as he raised them. 18RR:MSFT58-MSFT61. Furthermore, as in *Tiner*, the meetings with his direct supervisor (Lori Aulds) and skip-level

12

manager (David Tannenbaum) about which Mercieca complains "took place months before [he] resigned." 294 S.W.3d at 396.

In short, Tiner, like Mercieca, "was not satisfied with the way her supervisor handled [a] situation." *Id.* at 397. But such subjective frustration "does not rise to the level of an adverse employment action." *Id.* Like Tiner, Mercieca "was not fired or demoted, [he] was not reassigned or suspended. The minor actions that did occur do not represent meaningful changes in the conditions or privileges of [his] employment." *Id.*; 8RR65-70.

### 3. Mercieca's scattershot approach to proving constructive discharge is legally impermissible.

*Tiner* helps to illuminate the fundamental failings of Mercieca's constructive discharge proof. But Mercieca's constructive discharge theory is burdened by additional analytical problems not present in *Tiner*. First, the incidents upon which Tiner focused all happened within a discrete timeframe, while Mercieca's perceived slights are scattered over a period of years. Second, Tiner's incidents all happened ***before*** she resigned, thus conceivably supporting a claim that they compelled her departure. Mercieca did not resign until months after suing Microsoft. CRS11-33; **T**AB **J**.

The isolated incidents about which Mercieca complains were (and remain) untethered to any discrete time that could rationally be relevant to his reputed constructive discharge. Many of the incidents listed in his brief as comprising the

13

"constructive discharge puzzle" can be disregarded, in accordance with basic rules of cause and effect. Appellee's Br. at 27-30. To begin with, Mercieca's initial HR "formal complaint," dated April 19, 2010, describes concerns that do not relate to any anti-discrimination or anti-harassment policy. **TAB E**; **TAB M** at MS37863. Although Mercieca now tries to recast the April 2010 complaint as a "charge of gender discrimination,"[6] events that ***predate*** his April 2010 complaint cannot logically show that he was constructively discharged as retaliation for making that complaint. Appellee's Br. at 32.

For instance, Mercieca relies on the brief affair he had with Aulds in 2001.[7] He then describes comments Aulds made to him in 2008, when he fully supported her for the position of manager of his sales group.[8] *Id.* at 5-6; 33-35.

After emphasizing the 2001 affair, Mercieca restarts his narrative in "mid-2009 and early 2010," stating that "[o]n April 15, 2010"—several days before he had lodged any complaint against his managers—"Aulds told Mercieca he needed to find a new job." *Id.* at 27. To support this statement, Mercieca cites his own testimony in which he refers to a phone call he had with Aulds, which he secretly recorded. *Id.* (citing 9RR61). The transcription of that phone call does not support

---

[6] At trial, Mercieca asked the jury to find that his alleged constructive discharge was motivated by his age or his national origin, which the jury declined to do. **Tab A**, Question 8.

[7] Mercieca continues to reference a "sexual harassment" claim made in June 2010 premised on his 2001 relationship with Auld, which Microsoft investigated and found baseless and which even Mercieca dropped before the formal charge conference. CRS520-521; **TAB A**.

[8] *See, e.g.*, 8RR259-61; 8RR264-65; 8RR267; 18RR:MSFT10.

14

his representation that she told him he "needed to find a new job." 11RR9-52. Moreover, the call cannot be evidence of retaliatory constructive discharge, as Mercieca had not yet made the reputed charge of discrimination. Even Mercieca's self-serving (and inaccurate) testimony about this call shows that he was having communication problems with Aulds in "e-mail traffic going backwards and forwards" about his expense reports or "T&Es." 5RR238. Mercieca's prickliness in communications with his supervisor predated any alleged protected activity and had nothing to do with allegations of discrimination. 16RR:PX35; *see also* 11RR9-52; 18RR:MSFT20; 18RR:MSFT21; 18RR:MSFT40; 18RR:MSFT55; 18RR:MSFT57. This dispute about expense reports cannot reasonably be deemed part of what "compelled" him to resign years later.

Similarly, Mercieca cites his own testimony, in which he states that, leading up to March 26, 2010, he felt "subjected to a lot of harassment, bullying, and retaliation." 9RR7. First, Mercieca's subjective beliefs "are insufficient to establish a prima facie case" of an unlawful employment practice. *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 814 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Second, even Mercieca did not attribute his discomfort in the months leading up to his HR "formal complaint" to discrimination. In that HR complaint, he claimed that he felt "marginalized" because Rummel's concerns about him had "led to an escalation within HR" and to his management team, and he found it "extremely upsetting" that "[a]t no time was I ever consulted about this

15

by anyone." **TAB E**. Feeling "marginalized" and distressed because Rummel had voiced concerns about him cannot be evidence that Microsoft unlawfully retaliated against him for memorializing those feelings in an HR complaint that had not yet been made. Whatever Mercieca felt *before* April 19, 2010 when he engaged in the alleged protected activity does not prove that *afterwards* Microsoft retaliated by making circumstances so "intolerable" that a reasonable person would have been compelled to resign two years later.

Additionally, some of Mercieca's purported evidence that he was "constructively discharged" hinges on material that he only learned of through litigation. For instance, he refers obliquely to a "plan" to "eliminate" him. Appellee's Br. at 8, 27. His reputed proof of this "plan" is an internal Microsoft document—emailed on April 16, 2010 between two upper-level managers— describing a proposed "FY11 Field Sales Team Structure." 16RR:PX152 (proposing, *inter alia*, eliminating Mercieca's sales position as duplicative). There is no evidence that Mercieca ever saw this document while he worked at Microsoft. The document was prepared in response to a directive from upper management about the need to consider workforce reductions throughout the organization—and the proposal was never implemented. 6RR57-62. Despite Mercieca's post-resignation efforts to seize upon this document as confirming his suspicions, this internal discussion about a potential workforce reduction is unremarkable. Regardless, this evidence does not and cannot support a

constructive discharge finding. Mercieca did not know about this document and, as is evident by the fact that Microsoft continued to employ him for another two years until he voluntarily left, the plan was not implemented. Furthermore, as the proposal was made before Mercieca had lodged any HR complaint against his managers, it cannot conceivably be considered "retaliation" against Mercieca for an HR complaint he had not yet made. *Compare* 16RR:PX152 *with* **TAB E**.

Equally unsound is Mercieca's reliance on incidents that occurred after he had already sued Microsoft and even after he finally announced his departure. For instance, Mercieca cites as evidence of intolerable conditions his testimony about a potential "FY2012" evaluation that never took place. Appellee's Br. at 16, 29. Mercieca's last review was a mid-year review conveyed to him on March 9, 2012—several days after he had already resigned (via a letter sent from his litigation counsel to Microsoft's outside counsel on February 22, 2012). Mercieca's manager at that time, Joe Sahagian, only commenced giving the review because Mercieca had not told Sahagian about the decision to resign, "effective April 2, 2012," until they were in the middle of the review. **TAB I**; 10RR216. An event that never occurred and another that occurred only after a person has already resigned cannot evidence "intolerable" conditions that compelled the resignation.

Mercieca's alleged constructive discharge is premised entirely on his subjective interpretation of isolated incidents scattered over a ten-year period. This is an insurmountable problem. He cannot articulate specific events, related in time

17

to his decision to leave Microsoft, that the law recognizes as supporting a finding of objectively intolerable workplace conditions sufficient to compel a reasonable person to resign. Even if the isolated incidents in Mercieca's "constructive discharge puzzle" could be amassed together, they are legally insufficient to show intolerable conditions and thus actionable retaliation under the TCHRA. But isolated incidents "cannot be lumped together" to try to prove a discrete act, like a constructive discharge. *Univ. of Texas-Pan Am. v. Miller*, 2013 WL 4818355, *8 (Tex. App.—Austin Aug. 28, 2013, no pet.) (mem. op.); *see also Pegram v. Honeywell*, 361 F.3d 272, 280-81 (5th Cir. 2004) (finding various discrete employment actions not actionable under continuing violations doctrine); *Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 494 (Tex. App.–Amarillo 2009, pet. denied) (rejecting reliance on "events occurring between 1997 and [plaintiff's] termination in 2002" to prove employment experience was one of continuous discrimination).

### B. Mercieca Has No Evidence of Good Faith Engagement in a Protected Activity.

The TCHRA "protects from retaliation employees who oppose discriminatory employment practices." *San Antonio Water Sys. v. Nicholas*, -- S.W.3d --, 2015 WL 1873217, *1 (Tex. Apr. 24, 2015). As the Texas Supreme Court has recently stated, when "no reasonable person could have believed" that the complained-of conduct "gave rise to an actionable sexual-harassment [or discrimination] claim," the employee cannot show that he "engage[d] in a

18

protected activity under the TCHRA." *Id.* at \*1, \*2 (vacating jury finding for plaintiff on retaliation after concluding plaintiff "did not engage in a protected activity under the TCHRA").

This Court recently articulated the correct standard for satisfying the protected-activity element. *See Warrick v. Motiva Enter., L.L.C.*, 2014 WL 7405645, \*7 (Tex. App.—Houston [14th Dist.] Dec. 30, 2014, no pet.) (mem. op.). To qualify as a protected activity, "[t]he employee must put the employer on notice that the employee is opposing practices that the [employee] believes constitute prohibited discrimination." *Id.* (quoting numerous cases). "[T]he relevant inquiry is not [the employee's] intentions in sending [for instance an] e-mail, but whether her opposition to proscribed discriminatory practices was discernible in the e-mail itself." *Id.* at \*8 (citing *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (holding employee produced no evidence that "when she made her complaints to management, [she] ever mentioned that she felt she was being treated unfairly due to her *race* or *sex*")).

### 1. Mercieca's first HR complaint does not evidence good-faith engagement in a TCHRA-protected activity.

Mercieca now endeavors to recast his first HR complaint, submitted on April 19, 2010, as a charge of "gender-based discrimination." Appellee's Br. at 32. To support this characterization, Mercieca directs the Court away from the HR complaint itself—which says nothing about discrimination of any kind. **TAB E**.

19

Instead, Mercieca points to a *subsequent* complaint that Mercieca made, which he mentioned at some point during the internal ERIT investigation that commenced after June 9, 2010. Appellee's Br. at 32. During that investigation, Mercieca suggested that he had been offended by an email that O'Brien had sent to his entire U.S. sales team touting "Two Female Promotions to Director in USOEM!" **TAB N**. Mercieca does not direct the Court to the reputedly offending email, but to a summary of the entire internal investigation of his HR complaints. Appellee's Br. at 32 (citing 16RR:PX125). The summary upon which Mercieca relies notes that he did not mention discrimination of any kind until *after* he was notified in May 2010 that Rummel's allegations were to receive an ERIT investigation:

> The investigation did not reveal sufficient evidence supporting Michael's allegation of discrimination by the subjects because of his gender or national origin. First, Michael provided no corroborating witnesses or evidence that the treatment he received from subjects was related to either his gender or national origin. Second, there was a legitimate basis for the subjects' management of Michael in terms of career discussions, coaching and feedback on corroborated deficiencies in performance. Third, many of the items identified by Michael as discrimination were legitimate business/management decisions made by the subjects that he simply disagreed with. Fourth, many of the examples of unfair treatment by the subjects cited by Michael were contradicted by the interviews and documentary evidence. Finally, Michael had previously identified Tracy Rummel's allegations in November 2009 against him as the catalyst for his treatment by the subjects and it was not until he was notified of the ERIT investigation in May 2010 that he raised his allegations of discrimination.[6]

**Tab M** at MS37863.

Regardless of whether O'Brien's May 2010 email could be read objectively as offensive—as opposed to an effort to celebrate gender diversity within company management—it is not evidence that Mercieca's April 2010 HR complaint alleged discrimination. First, his April 2010 HR complaint was made weeks *before*

20

O'Brien's email was sent.  **TAB G**.  A complaint about an email sent in May 2010 cannot support a finding that his April 2010 complaint informed Microsoft of a charge of "gender discrimination."  Second, Mercieca's invocation of the O'Brien email would not have put Microsoft on notice that *Mercieca* was claiming discrimination or sexual harassment.  "For workplace comments to provide sufficient evidence of discrimination, the comments must be," *inter alia*, "(1) related to the plaintiff's protected class, (2) proximate in time to the adverse employment decision, … and (4) related to the employment decision at issue." *Chandler*, 376 S.W.3d at 816.  The O'Brien email was not about a class to which Mercieca belonged; the email was sent nearly two years before Mercieca resigned; and the email was unrelated to any employment decision that affected Mercieca. **TAB N**.

Mercieca's April 2010 HR complaint speaks for itself and confirms what the record otherwise shows:  that in late February 2010, Mercieca learned from Aulds that Rummel had raised a concern about Mercieca's behavior and that Rummel had reported her concerns; he then began demanding an "exoneration" regarding a "baseless rumor" about him that he felt Rummel had authored and Aulds had needlessly referred to HR.  7RR159; 7RR161-64.  An objective reading of the April 2010 complaint (**TAB E**) and his communications with HR leading up to the emailing of that complaint (18RR:MSFT64; 18RR:MSFT67) show that his conduct did not qualify as a TCHRA-protected activity.  *See, e.g., Warrick*, 2014 WL

21

7405645 at *8-*9 (explaining that employee's email did not qualify as TCHRA-protected activity because it only accused a co-worker of "unethical conduct," stated that she had written "the EEOC about how the [other] employee" was "stealing time," and "alleged serial bullying" but did not notify employer of mistreatment "based on a protected characteristic"). Instead, the April 2010 complaint confirms, as Mercieca later testified, that he felt "betrayed" that his managers had been "talking behind his back" about Rummel's concerns and had not come first to him—a long-time employee—about the concerns of a mere "contract" worker. 7RR168-170. During his initial conversations with HR, he did not mention sexual harassment or discrimination based on gender or national origin or any other protected ground. 12RR19-27; 12RR31-32; 12RR35. As he said at the time, he was motivated to submit a counter HR complaint, directed against his managers, to "play the percentage shot." 7RR183.

### 2. Mercieca's second HR complaint does not evidence good-faith engagement in a TCHRA-protected activity.

As explained in the Appellant's brief, the "supplementation" that Mercieca's lawyer submitted to Microsoft's HR department on June 9, 2010 on Mercieca's behalf does not evidence a good faith claim of discrimination. Appellant's Br. at 41-43; *see also* **TAB M** at MS37863 (noting "it was not until [Mercieca] was notified of the ERIT investigation in May 2010 [of Rummel's allegations] that he raised his allegations of discrimination."). The "supplementation" does not add

22

any concrete information regarding his grievances; it contains only conclusory assertions that he is complaining of "harassing, discriminatory, and retaliatory conduct based on his gender and national origin" and "sexual harassment," words invoked solely to trigger a Microsoft ERIT investigation of his grievances. TAB G; 8RR41-41; 11RR216-217; 18RR:MSFT97; 18RR:MSFT313. The "supplementation" was only submitted after Mercieca and his lawyer had learned from a Microsoft ERIT investigator that Mercieca's April 2010 complaint did not fall within the scope of the company's anti-discrimination and anti-harassment policies. 18RR:MSFT97; 18RR:MSFT115; 18RR:MSFT74; 18RR:MSFT78-80. Only after the investigator had explained at length precisely why Mercieca's grievances fell outside ERIT's scope did Mercieca's lawyer prepare the June 9 "supplementation" including, for the first time, vague charges of discrimination.

As this Court has explained, "[a] vague charge of discrimination will not invoke protection under the statute." *Azubuike v. Fiesta Mart, Inc.*, 970 S.W.2d 60, 65 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Vague references to discrimination and harassment do not "put the employer on notice that the complaint was based on" unlawful employment practices. *Harris-Childs*, 169 F. App'x at 916.

Even assuming that Mercieca subjectively believed that what he had experienced was unlawful "discrimination" or "sexual harassment," his belief is

23

insufficient as a matter of law. "Subjective beliefs of discrimination alone are insufficient to establish a prima facie case."

## C. Mercieca Has No Evidence of Actionable Retaliation.

### 1. Mercieca has no evidence of causation.

An employer cannot conceivably retaliate against an employee for engaging in a protected activity until after the employee engages in something that qualifies as TCHRA-protected conduct. *See, e.g.*, *Zaffuto v. City of Hammond*, 308 F.3d 485, 493 (5th Cir. 2002) (holding that the plaintiff failed to state a Title VII retaliation claim where the record demonstrated that his suspension occurred before he engaged in the protected activity); *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 507 (5th Cir. 2002) (affirming grant of summary judgment on retaliation claim where there was little evidence to show that the defendant "took certain actions because of [plaintiff's] protected activity"). Further, Texas law requires evidence of <u>but-for</u> causation: "plaintiff must establish 'but for' causal nexus between the protected activity and the prohibited conduct." *Chandler*, 376 S.W.3d at 823 (finding "no evidence [plaintiff] engaged in the protected activity of complaining that he was not included [on trip list] *because of his race* and was then subsequently terminated") (emphasis retained).

To try to elude his causation problem, Mercieca has continuously shifted this retaliation theory. For instance, in his opening statement, Mercieca's counsel suggested that his managers' motivation for "retaliating" against him was "because

he's got no high school education, he's got no college education." 3RR205. In closing, Mercieca's counsel argued that Microsoft was motivated by Mercieca's age (which no one at trial knew) and his national origin (British). 12RR121-22. Age discrimination was not even mentioned in his EEOC charge or in either of his internal HR complaints. **TAB E & TAB G**.

Now, on appeal, Mercieca suggests that Microsoft "conspired to launch their secret anti-Mercieca campaign" after he "report[ed] the O'Brien incidents." Appellee's Br. at 36. Indeed, that "campaign" was so "secret" that he has no evidence to support it. Moreover, this newest theory does not help him establish causation because Mercieca only complained about O'Brien's comments (which were neither about, nor directed at, Mercieca) *after* Rummel had expressed concerns about his conduct and *after* he had complained to HR because his managers had listened to her. *Compare* **TAB E** *with* **TAB N**. Moreover, his alleged "constructive discharge" was nearly two years thereafter. **TAB I**. In short, there is no evidence of any adverse employment action proximate to any protected activity, thus no causation. *See Chandler*, 376 S.W.3d at 816 (finding plaintiff presented "no evidence" that racially derogatory comments "were made close to the time of the adverse employment decision at issue" and thus could not support TCHRA claims).

**2. Mercieca has no cognizable theory, only impermissibly stacked inferences to support his so-called "secret anti-Mercieca campaign."**

Mercieca's brief confirms that he has never had a cognizable retaliation theory. He relies on a conspiracy theory based entirely on suspicion and stacked inferences. 8RR211-12. "[A]n inference stacked only on other inferences is not legally sufficient evidence." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (citing *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001)).

A claim cannot withstand a legal sufficiency challenge by recourse to inferences derived "from meager circumstantial evidence." *Wright v. Wal-Mart Stores, Inc.*, 73 S.W.3d 552, 555 (Tex. App.—Houston [1st Dist.] 2002, no pet.). "[A] vital fact may not be established by piling inference upon inference." *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968). Evidence that is "'so weak as to do no more than create a mere surmise or suspicion'" of its existence is, in legal effect, no evidence. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (citation omitted). "'[S]ome suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'" *Marathon*, 106 S.W.3d at 728 (citations omitted). Mercieca's evidence equates to nothing more than what the cases describe as "mere surmise or suspicion." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992).

26

One aspect of Mercieca's disparate retaliation theories has been consistent: he believes that his managers listened to Rummel's concerns about him and then later "encouraged" her to "revive" those concerns by going to HR after he submitted his April 2010 HR complaint objecting to his managers' failure to "consult" with him about Rummel's concerns first. 8RR252; 8RR257-58; 11RR70-76. He has repeatedly characterized Rummel's concerns as a "false sexual harassment" complaint. For instance, in Mercieca's statement of the case, he describes his retaliation claim this way: "Microsoft retaliated against him … [and] caused or encouraged another Microsoft employee to file a false sexual harassment charge against him." Appellee's Br. at 1; *see also* CRS6-10; **TAB H** ¶53 (alleging a "campaign of retaliation against" him).

Even if such a theory could form the basis of actionable retaliation, no evidence, only rank speculation, supports Mercieca's theory that some "secret anti-Mercieca campaign" was launched against him through Tracy Rummel. Appellee's Br. at 36. There is no evidence that anyone "caused or encouraged" Rummel to complain about Mercieca. 4RR150-51.

Moreover, there is no evidence that Rummel ever filed a "false sexual harassment charge." The uncontested evidence shows that, starting in November 2009, Rummel spoke to various Microsoft personnel about her concerns. She spoke to Mercieca directly about her concerns. Then, after she joined Microsoft as a full-time employee, Rummel experienced repercussions from having told

27

Mercieca about her concerns, including being removed from an account that she worked on with him. Therefore, she took these concerns to an HR director. 9RR201; 16RR:P25-A; 4RR95-106; **TAB F**. The HR intake form that resulted does not support an inference that Rummel had been "encouraged" to bring "sexual harassment" allegations against Mercieca, as he suggests. The intake form notes the same issues Rummel had raised a few months earlier: that Mercieca had tried to diminish her in front of a client by suggesting that she and he were dating and by making inappropriate comments that were sexual in nature. **TAB F**. The form also notes her new concern that, a few days after she spoke to Mercieca, a Microsoft business partner asked that she be removed from his account. *Id.*

Mercieca cites nothing in the record to support the contention that Rummel's statements, as recorded by HR, were actually false. For instance, when Rummel called Mercieca to discuss her concerns about comments he had made at a client dinner, Mercieca threatened to "circle back" to those who had attended the event. 9RR57; 16RR:P25-A. Mercieca followed through on his threat; and the client representative to whom Mercieca "circled back" was Jason von Cordsen of Bass Computers. Von Cordsen, called by Mercieca at trial as a witness, admitted that nine days after the client event in question, he declared publicly at a Microsoft-sponsored meeting that he was not "getting any value" from Rummel so he wanted her taken off the account she was working on with Mercieca. 10RR84-86. In light

28

of this testimony,[9] Mercieca has no basis for suggesting that Rummel's statement, as reported on the HR intake form, was false:

> **Within days of the dinner, the partner told Tracy that she was not adding any value and didn't want to have her participating on the account. Tracy is continues to be concerned that Michael's relationship with the partner and her asking him to stop making advances is now impacting her work relationship with the partner.**

**TAB F**.

Mercieca also admitted at trial that he had invited Rummel—a young, single woman—to stay at his house when she was in town and that he had made comments at a client dinner that made her uncomfortable, as the HR intake form states. *Compare id. with* 8RR45-46, 9RR32, 4RR86-90. Indeed, the partial recording he secretly made of his conversation with Rummel shows that he knew he had said things at a client dinner, for instance, about "playing guitar in [her] bedroom," that had caused her concern. 4RR87.

The "evidence" Mercieca offered to buttress his suspicion that Rummel was put up to making a complaint against him is no evidence at all: (1) a cell phone record showing that Rummel, a Microsoft employee, called Aulds, a Microsoft manager in Rummel's division, at various times, including the day that Rummel

---

[9] Von Cordsen also admitted that he was told about the confidential HR complaints brought by and about Mercieca and that his sole source of information about these internal HR matters was Mercieca himself. 10RR123-124.

29

followed-up with HR about Mercieca (PX243); and (2) an indemnification agreement that Microsoft executed with Rummel after Mercieca sued her (PX245). Appellee's Br. at 12, 16.[10]  A "secret anti-Mercieca campaign" (let alone actionable retaliation) cannot reasonably be inferred from this evidence. *Marathon*, 106 S.W.3d at 728 (reminding that suspicion "is not the same as some evidence").

These efforts to spin a conspiracy out of stacked inferences epitomizes the concerns described in the seminal legal sufficiency case *City of Keller v. Wilson*, 168 S.W.3d 802, 813-14 (Tex. 2005).  In *Keller*, the Texas Supreme Court used, as an example, evidence that a macaroni salad was spilled on a grocery store's floor. The court considered whether that fact could be used to support an inference that the grocery store was on notice of the spill:  "one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite—that a sloppy shopper recently did both."  *Id.* at 814.  As the court explained, the competing inferences negate each other and amount to no evidence:  "When the circumstances are equally consistent with either of two facts, neither may be inferred."  *Id.* at 813.

Rummel and Aulds independently denied talking about Rummel's complaint against Mercieca after Rummel first sought guidance from Aulds in November

_____

[10] The Appellee's brief only mentions the indemnification agreement, which was improperly admitted, in passing, but the agreement was a focal point for Mercieca at trial. 4RR157; 4RR276-78; 12RR106-107; 12RR112-133.

2009 and Aulds referred Rummel to HR. 4RR150-51; 11RR74. Moreover, Mercieca admitted that he had no evidence that his complaints were "leaked" to Aulds or Rummel to help prepare a complaint against him. 9RR38. Even if the jury disregarded Rummel's testimony about why she went back to HR when she did, that would "[n]ormally . . . not [be] considered a sufficient basis for drawing a contrary conclusion." *Mathis v. Lockwood*, 166 S.W.3d 743, 745 (Tex. 2005) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984)). Rummel, like Mercieca, had a right to go to HR about her concerns under the company's open-door policy. 18RR:MSFT235B; 11RR227-229. There is no evidence showing that Microsoft would have done anything differently but for Mercieca's internal HR complaints. *See Chandler*, 376 S.W.3d at 823 (finding no evidence of but-for causation to support a retaliation claim).

## II. ALTERNATIVELY, MERCIECA'S DAMAGES EVIDENCE IS SO TAINTED THAT THE ONLY REMEDY IS TO REVERSE AND RENDER JUDGMENT FOR MICROSOFT.

The damages problems in this case, should the Court reach them, are so fundamental as to warrant a reversal and rendering of judgment in Microsoft's favor. *See Houston Unlimited, Inc. v Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014) (finding damages evidence legally insufficient and reversing and rendering a take-nothing judgment in the defendant's favor).

31

**A. The Back-Pay Award Is Unsustainable.**

Back pay, as Mercieca acknowledges, *may* be awarded by a district court under the TCHRA to compensate for a "prohibited employment action." Appellee's Br. at 38. Here, there was no prohibited employment action, so no back-pay award was proper. Moreover, the court had no discretion to make this $623,065 award based on a jury finding that utterly ignored the instruction to account for Mercieca's failure to mitigate his damages. Mercieca's only response is that he had no duty to mitigate his damages while still employed by Microsoft. Appellee's Br. at 41. This is correct—*a fortiori,* he cannot, as a matter of law or equity, recover for a claim alleging a "constructive discharge" brought when he was still gainfully employed by Microsoft. Additionally, Mercieca cites no evidence of *any* job search other than Mercieca's unsubstantiated testimony that he looked at "a great many" job prospects. *Id.* at 41-42. He cannot cite anything specific because no evidence of any job applications exists. "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Methodist Hosp. v. Zurich Am. Ins. Co.*, 329 S.W.3d 510, 530 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). And a conclusory statement does not even create a fact issue. *Id.*

**B. The Compensatory Damages Award Is Unsustainable.**

The compensatory damages award (of $300,000) is based on two jury findings devoid of evidentiary support: a finding of $1,000,000 in mental anguish

damages and $9,999,999.24 in punitive damages. The capped amount, although well below what the jury awarded,[11] cannot stand because no evidence supports it.

Mercieca incorrectly insists that the jury was free to make whatever mental anguish award it liked since the charge did not define the term. Appellee's Br. at 42. For this proposition he cites *Jefferson Cnty v. Davis*, 2014 WL 4262184 (Tex. App.—Houston [14th Dist.] Aug. 28, 2014, pet. filed) (mem. op.). This citation is an odd choice as the case resulted in zeroing-out a $500,000 mental anguish award. *Id.* at *9-*10.

The more apt authority is *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 753 (Tex. App.—Houston [14th Dist.] 1998, no pet.), in which this Court noted that "[e]motional distress is a subjective injury that is hard to predict, often speculative, easily fabricated, difficult to verify, and almost impossible to refute." These pitfalls are precisely why the Supreme Court has taken pains "to fashion principles permitting recovery for severe emotional distress while maintaining constraints and safeguards against those who are merely disappointed, embarrassed, or angry." *Id.* Mercieca's alleged distress does not satisfy the standard because "liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities[.]" *Id.* at 753-54.

---

[11] Mercieca's counsel invited error by urging the jury to award $1,000,000 in mental anguish and "ten million or more" in punitive damages knowing full well that this was a capped case. 12RR125; 12RR131.

33

Mercieca expressed his view that his experience at Microsoft was "soul destroying," and his brief, citing his own testimony as evidence, states that he "now suffers from depression, for which he takes medication, and his sleep is erratic." Appellee's Br. at 44. Yet his personal therapist/expert acknowledged at trial that the only mental disorder with which Mercieca had been diagnosed, *starting in 2003*, was "adjustment disorder," not depression, for which he was prescribed Lexapro, an anti-depressant, which he first took *in 2001* after his divorce. 9RR110-118; 9RR15. This diagnosis—which was consistent through 2011—was made over a decade *before* his alleged "constructive discharge." *Id.* Additionally, the "stressors" to which Mercieca's therapist attributed his condition were, initially, a dysfunctional sexual relationship and then a child-custody dispute with his ex-wife that had required police intervention and resulted in Mercieca being placed in handcuffs. *Id.* Mercieca's therapist's testimony established uncontrovertibly that Mercieca's mental-health issues began years before Rummel raised concerns about his conduct in November 2009. As Mercieca's brief states, "the Bass Computers function" in November 2009 was "the event that started it all" with respect to his grievances against Microsoft. Appellee's Br. at 13. His long-standing mental distress, which predates the Bass Computers event by over six years, cannot be evidence of compensable "mental anguish damages" that *resulted from* a constructive discharge that he claims occurred two years thereafter. TAB A, Question 14.

34

Moreover, to support an award of mental anguish damages, "[t]here must be both evidence of the existence of compensable mental anguish damages *and* evidence to justify the amount awarded." *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) (emphasis added). Mercieca's testimony regarding his anxieties cannot justify the $1,000,000 finding that is the basis for the trial court's award. Indeed, a case Mercieca suggests is analogous—where the court found sufficient evidence to uphold a mental anguish award—is completely inapposite. *See Bennett v. Grant*, 2015 WL 1324857 (Tex. App.—Austin Mar. 20, 2015, no pet.). *Bennett* affirmed an award of only $5,000 in mental anguish damages where the plaintiff had had to move repeatedly to protect himself from threats of violence from the defendant and had evidence of pronounced symptoms engendered by the stress. *Id.* at *11.

Likewise, in seeking to defend the punitive damages finding, Mercieca rattles off a selective list of his subjective view of events entirely denuded of context. Appellee's Br. at 51-52. His description of these events cannot withstand scrutiny upon looking at the evidence itself. For example, Mercieca refers to Tannenbaum's answer to a hypothetical question from Mercieca's lawyer about what Aulds might have intended when she discussed Mercieca's "mental state with Mercieca's partner"—*i.e.*, with Jason von Cordsen, a client representative of Bass Computers. Appellee's Br. at 52. By looking at the testimony of von Cordsen himself—the only witness, other than Aulds, privy to the conversation to which

35

Mercieca alludes—one finds that he did not view the conversation as retaliatory, malicious, or in any way negative:

```
     . . . it sounded like [Aulds] was
genuinely concerned about Michael's state of
paranoia, that -- that Michael -- Michael was
just overdocumenting things and – and asking
questions of other people, if you know, to --
to where it just seemed to her that he was
extremely paranoid and -- and something was
going on.

     And I know that there was a taped
conversation between me and Michael that
evening and -- over the phone and I -- I had
brought up to Michael that I genuinely thought
-- at the time, I genuinely thought that --
that they were -- they were concerned for him.
```

10RR92. Von Cordsen also described Aulds as "very professional" during this conversation. 10RR127. Therefore, Mercieca's reliance on how a different witness, with no personal knowledge of this conversation, responded to a leading question is no evidence of Microsoft's "malice."

When the standard is "clear and convincing," as it is with punitive damages, courts "must consider *all* the evidence," not just the evidence favorable to the jury's finding. *Keller*, 168 S.W.3d at 817 (emphasis retained). That would include the evidence of Microsoft's independent internal investigation, which revealed that Mercieca, not his managers, seemed animated by suspect motives. *See, e.g.*, **TAB M**. Even if Mercieca's self-serving and inaccurate representatives of the evidence

36

are believed, on their face, these events do not amount to clear and convincing evidence of malice or reckless indifference on Microsoft's part.

## C. The Attorneys' Fee Award Is Unsustainable.

Finally, the attorneys' fees award (of $769,505.98 plus $192,376.50 enhancement) cannot stand because it reflects an exercise of discretion that was "'so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 580 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citation omitted). As explained in the Appellant's brief, the evidence used to support the fee award, which was calculated based on the lodestar method, is so facially suspect that it amounts to no evidence. Therefore, relying on that evidence in the wake of the Texas Supreme Court's recent mandates regarding the proof required to support an attorneys' fee award is indefensible. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012);[12] *City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) (reaffirming *El Apple* and confirming that hyperbolic testimony as "evidence" of attorneys' fees is unacceptable). Mercieca's counsel admitted before the trial court that they had manufactured their billing records instead of relying on contemporaneous records that they claimed existed, yet failed to produce; and the trial court's fee award fails to account for the rampant improprieties and defects in those "records" that are

---

[12]*El Apple* begins its analysis by citing *Hensley v. Echerhart*, 461 U.S. 424 (1983), which first required attorneys seeking fee awards in employment discrimination cases to present detailed hourly time records and to segregate issues and claims in their bills.

evident on their face. 19RR:MSFT411. The court then inexplicably enhanced the award, without indicating what, if any, factors might justify that decision, despite Microsoft's request for findings and conclusions. **TAB C**.

Mercieca devotes substantial space to arguments under the relevant lodestar factors to suggest what the trial court might have had in mind. Appellee's Br. at 59-83. *But see El Apple*, 370 S.W.3d at 765 (accepting that a lodestar derived from a "legitimate base" is presumptively reasonable while noting that an enhancement must be justified). None of Mercieca's arguments can redeem the illegitimate base used to support his request for a fee award. Indisputably, a trial court abuses its discretion by awarding fees based on flagrantly unreliable evidence. *United Nat'l Ins. Co. v. AMJ Invests., LLC*, 447 S.W.3d 1, 16 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd) (holding that party choosing to use lodestar method is "required to introduce sufficient evidence to allow the factfinder to apply it.").

Because every aspect of the damages award made to Mercieca is based on legally insufficient evidence, the only appropriate relief is to reverse and render a take-nothing judgment—should the Court even reach those issues.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, as well as those described in the Appellant's brief, Microsoft asks that the Court reverse and render a take-nothing judgment for Microsoft and award any other relief to which Microsoft shows itself justly entitled.

Respectfully submitted,

BECK REDDEN LLP

By: */s/ Gretchen S. Sween*
    Eric J.R. Nichols
    State Bar No. 14994900
    enichols@beckredden.com
    Gretchen S. Sween
    State Bar No. 24041996
    gsween@beckredden.com
515 Congress Avenue, Suite 1900
Austin, TX  78701
(512) 708-1000
(512) 708-1002 (Fax)

    Russell S. Post
    State Bar No. 00797258
    rpost@beckredden.com
    Kate Skagerberg
    State Bar No. 24058578
    kskagerberg@beckredden.com
1221 McKinney Street, Suite 4500
Houston, TX  77010
(713) 951-3700
(713) 951-3720 (Fax)

COUNSEL FOR
APPELLANT/CROSS-APPELLEE
MICROSOFT CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2015, a true and correct copy of the foregoing Appellant's Reply Brief has been served on all counsel of record by the e-filing service provider, if registered, otherwise by email, as follows:

Paul T. Morin
pmorin@austin.rr.com
Roy A. Pollack
roypollack@yahoo.com
503 W. 14th Street
Austin, TX 78701

D. Todd Smith
Smith Law Group, P.C.
todd@appealsplus.com
1250 Capital of Texas Highway South
Three Cielo Center, Suite 601
Austin, TX 78746

**Counsel for Appellee/Cross-Appellant, Michael Mercieca**

*/s/ Gretchen S. Sween*
Gretchen S. Sween

## CERTIFICATE OF COMPLIANCE

1.      On July 2, 2015, the Court granted Appellant's motion to exceed the previously established word limit for this reply brief.  This brief complies with the Court's order because it contains 9,361 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(2).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: July 6, 2015.

/s/ Gretchen S. Sween
Gretchen S. Sween
*Counsel for Appellant*

41

No. 14-15-00024-CV

IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

MICROSOFT CORPORATION,
Appellant/Cross-Appellee,

v.

MICHAEL MERCIECA,
Appellee/Cross-Appellant.

On Appeal from the 353rd District Court, Travis County, Texas
Trial Court Cause No. D-1-GN-11-00130
The Honorable Tim Sulak, Presiding

APPENDIX TO
APPELLANT'S REPLY BRIEF

**Tab**

A    Jury Charge/Verdict

C    Findings of Fact and Conclusions of Law

E    Internal HR Submission styled "Formal Complaint of Michael Mercieca," dated April 19, 2010 (18RR:MSFT90)

F    Employee Relations Investigations Intake Form, dated May 10, 2010 (18RR:MSFT108)

G    Internal HR Submission styled "Supplementation," dated June 9, 2010 (18RR:MSFT121)

H    Plaintiff's Third Amended Petition (CRS499-519)

I    Letter announcing Mercieca's resignation, dated February 22, 2012, effective April 2, 2012 (18RR:MSFT221)

J    2011 Performance Review for Michael J.B. Mercieca, dated September 8, 2011 (18RR:MSFT216)

M    Employee Relations Investigations Summary Memo, dated October 4, 2010 (18RR:MSFT180)

N    Email string from M. Mercieca to G. Houston, dated May 5, 2010 (19RR:MSFT297)

# Tab A
**Jury Charge/Verdict**

ORIGINAL

NO. D-1-GN-11-001030

| | | |
|---|---|---|
| MICHAEL MERCIECA, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | 353RD JUDICIAL DISTRICT |
| | § | |
| TRACY RUMMEL and | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## COURT'S CHARGE TO THE JURY

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1. Do not let bias, prejudice, or sympathy play any part in your decision.

Filed In The District Court
of Travis County, Texas

MAY – 5 2014

At 5:56 P.M.

Amalia Rodriguez-Mendoza, Clerk

1

Filed In The District Court
of Travis County, Texas

MAY – 7 2014

At 3:45 P.M.

Amalia Rodriguez-Mendoza, Clerk

1185

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

   The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

8. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

9. Do not answer questions by drawing straws or by any method of chance.

10. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

11. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

2

12. Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

13. You are the sole judges of the credibility or believability of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness you should consider his or her relationship to the Plaintiffs or to the Defendants; his or her interest, if any, in the outcome of the case; his or her demeanor or manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she has testified; his or her candor, fairness and intelligence; and the extent to which he or she has been supported or contradicted by other credible evidence. You may in short, accept or reject the testimony of any witness in whole or in part.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

## Other Instructions and Definitions:

1.      Microsoft Corporation may act only through natural persons as its agents or employees. Any agent or employee of Microsoft Corporation may bind Microsoft Corporation by his/her acts and declarations made while acting within the scope of his/her authority delegated to him/her by Microsoft Corporation, or within the scope of his/her duties as an employee of Microsoft Corporation.

   "Course and scope" means that the employee committing the act was acting within the scope of his/her general authority and the act was in furtherance of Microsoft Corporation's business and for the accomplishment of the object for which the employee was hired.

2.      "Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

3.      "Malice" means a specific intent by the defendant to cause substantial injury or harm to Michael Mercieca.

4.      "Gross negligence" means an act or omission by the defendant, which when viewed objectively from the standpoint of that defendant at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which that defendant has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

5.      "Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

4

## QUESTION 1

Did Tracy Rummel publish the following in or after May 2010?

"Publish" means intentionally or negligently communicating the matter to a person other than Michael Mercieca who is capable of understanding its meaning.

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

Answer "Yes" or "No" for each of the following:

a. That Michael Mercieca sexually harassed her.

Answer: ___Yes___

b. That Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account.

Answer: ___Yes___

If you answered "Yes" to any subpart in Question 1, then answer the following question for each corresponding subpart. Otherwise, do not answer the following question.

## QUESTION 2

Were any of the statements in Question 1 defamatory concerning Michael Mercieca?

"Defamatory" means an ordinary person would interpret the statement in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach the person's honesty, integrity, virtue, or reputation.

In deciding whether a statement is defamatory, you must construe the statement as a whole and in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.

5

1189

Answer "Yes" or "No" for each of the following you have found in Question 1, if any:

    a. That Michael Mercieca sexually harassed her.

Answer:    __Yes__

    b. That Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account.

Answer:    __Yes__

If you answered "Yes" to any subpart in Question 2, then answer the following question for each corresponding subpart. Otherwise, do not answer the following question.

## QUESTION 3

Were any of the following statements in Question 1 substantially true at the time it was made as it related to Michael Mercieca?

A statement is "substantially true" if it varies from the literal truth in only minor details or if, in the mind of the average person, the gist of it is no more damaging to the person affected by it than a literally true statement would have been.

In connection with this question, you are instructed that Tracy Rummel has the burden to prove substantial truth by a preponderance of the evidence.

Answer "Yes" or "No" for each of the following you have found in Question 1, if any:

    a. That Michael Mercieca sexually harassed her.

Answer:    __No__

    b. That Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account.

Answer:    __No__

If you answered "No" to any subpart in Question 3, then answer the following question for each corresponding subpart. Otherwise, do not answer the following question.

6

## QUESTION 4

Did Tracy Rummel convey any of the statements to persons other than those having an interest or duty in the matter to which the communications relate?

Answer "Yes" or "No" for each of the following you have found in Question 1, if any:

a. That Michael Mercieca sexually harassed her.

Answer: _____ *No* _____

b. That Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account.

Answer: _____ *No* _____

        If you answered "No" to either subpart of Question 4, then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION 5

Do you find that, at the time Tracy Rummel made the statements below, she

1.      Knew the statement was false as it related to Michael Mercieca, or

2.      Made the statement with a high degree of awareness that it was probably false, to an extent that Tracy Rummel in fact had serious doubts as to the truth of the statement?

"False" means that a statement is (i) not literally true and (ii) not substantially true. A statement is "substantially true" if it varies from the literal truth in only minor details or if, in the mind of the average person, the gist of it is no more damaging to the person affected by it than a literally true statement would have been.

Answer "Yes" or "No" as to each statement to which you found in Question 1, if any.

a. That Michael Mercieca sexually harassed her.

Answer: _____ *Yes* _____

b. That Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account.

Answer: _____ *No* _____

7

1191

If you answered "Yes" to either subpart of Question 1, then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION 6

Do you find that Michael Mercieca consented to, authorized, procured, or invited the publication of the statements you found in Question 1?

Answer "Yes" or "No" for each of the following you have found in Question 1, if any:

 a. That Michael Mercieca sexually harassed her.

Answer: *N O*

 b. That Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account.

Answer: *N O*

## QUESTION 7

Was Michael Mercieca constructively discharged from Microsoft?

 An employee is considered to have been "constructively discharged" when an employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign.

Answer "Yes" or "No."

 Answer: *Yes*

 If you answered "Yes" to Question 7, then answer the following question. Otherwise, do not answer the following question.

8

## QUESTION 8

Were any of the following motivating factors in Michael Mercieca's constructive discharge, if any?

A "motivating factor" in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.

Answer "Yes" or "No" for each of the following:

a. Michael Mercieca's age:      _No_

b. Michael Mercieca's national origin:      _No_

If you answered "Yes" to any subpart of Question 8, then answer the following question for that corresponding subpart. Otherwise, do not answer the following question.

## QUESTION 9

Would Microsoft have taken the same action inquired about in Question 8 when it did, in the absence of the following impermissible motivating factor(s) you have found in Question 8, if any?

Answer "Yes" or "No" for each corresponding subpart you have found in Question 8, if any:

a. Michael Mercieca's age: _____

b. Michael Mercieca's national origin: _____

## QUESTION 10

Did Michael Mercieca oppose a discriminatory practice, make or file a complaint of discrimination, or assist or participate in an investigation concerning a complaint of discrimination based on a reasonable, good faith belief that the conduct he complained of actually violated anti-discrimination, anti-harassment laws, even if he was ultimately mistaken?

Answer "Yes" or "No."

Answer: _Yes_

9

If you answered "Yes" to Questions 7 AND 10, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 11

Was Michael Mercieca constructively discharged because he opposed a discriminatory practice, made or filed a complaint of discrimination, or assisted or participated in an investigation concerning a complaint of discrimination?

> Michael Mercieca must establish that without his opposition to a discriminatory practice, making or filing a complaint of discrimination, or assisting or participating in an investigation concerning a complaint of discrimination, if any, Michael Mercieca would not have been constructively discharged when, and if, he was. There may be more than one cause for an employment decision. Michael Mercieca need not establish that his filing a complaint of discrimination or participating in an investigation concerning a complaint of discrimination, if any, was the sole cause of the constructive discharge, if any.

Answer "Yes" or "No."

> Answer: ___Yes___

If you answered "Yes" to subpart (a) to Question 4 OR "Yes" to subpart (a) of Question 5, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 12

What sum of money, if paid now in cash, would fairly and reasonably compensate Michael Mercieca for his injuries, if any, that were proximately caused by the statement that Michael Mercieca sexually harassed her?

> Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any.

10

1.      Injury to reputation sustained in the past.

Answer: $_____ 5,000 _____

2.      Injury to reputation that, in reasonable probability, Michael Mercieca will sustain in the future.

Answer: $_____ 10,000 _____

3.      Mental anguish sustained in the past.

Answer: $_____ 5,000 _____

4.      Mental anguish that, in reasonable probability, Michael Mercieca will sustain in the future.

Answer: $_____ 0 _____


If you answered "Yes" to subpart (b) to Question 4 OR "Yes" to subpart (b) of Question 5, then answer the following question.  Otherwise, do not answer the following question.


# QUESTION 13

What sum of money, if paid now in cash, would fairly and reasonably compensate Michael Mercieca for his injuries, if any, that were proximately caused by the statement that Michael Mercieca retaliated against her by getting her removed as marketing consultant from the Bass Computer account?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any.

1.      Injury to reputation sustained in the past.

Answer: $_____

2.      Injury to reputation that, in reasonable probability, Michael Mercieca will sustain in the future.

Answer: $_____

11

3.      Mental anguish sustained in the past.

Answer: $_____

4.      Mental anguish that, in reasonable probability, Michael Mercieca will sustain in the future.

Answer: $_____

If you answered "No" to any subpart to Question 9 or "Yes" to Question 11, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 14    *from*

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Michael Mercieca for his damages, if any, that resulted such conduct?

Consider the following elements of damages, if any, and none other. Do not include interest on any amount of damages you may find. Do not include back pay or interest in calculating compensatory damages, if any. Do not include in your answer any amount that you find Michael Mercieca could have avoided by the exercise of reasonable care.

You are instructed that any monetary recovery for "back pay" is subject to federal income taxes. Any recovery for mental anguish in the past and future is not subject to federal income taxes.

Answer in dollars and cents for damages, if any.

1.      Back pay.

"Back pay" is that amount of wages and employment benefits that Michael Mercieca would have earned if he had not been subjected to his employer's unlawful conduct less any unemployment compensation benefits he has received in the interim.

"Employment benefits" include sick-leave pay, vacation pay, profit-sharing benefits, stock options, pension fund benefits, housing or transportation subsidies, bonuses, monetary losses incurred as a result of the loss of health, life, dental, or similar insurance coverage.

Answer: $ 623,065

2.      Mental anguish damages in the past.

Answer: $ 1,000,000

12

3.    Compensatory damages in the future, which include loss of benefits, bonuses, stock options, 401k matching contributions, and any profit-sharing plan contributions, that, in reasonable probability, will be sustained in the future.

Answer: $_____*0*_____

4.    Mental anguish that, in reasonable probability, will be sustained in the future.

Answer: $_____*0*_____

Answer the following question only if you answered:

(1) "Yes" unanimously to any subpart of Question 1

(2) AND "Yes" unanimously to the corresponding subpart of Question 2;

(3) AND "No" unanimously to the corresponding subpart of Question 3;

(4) AND "Yes" unanimously to the corresponding subpart of Question 4; OR "No" to the corresponding subpart of Question 4 and "Yes" unanimously to the corresponding subpart of Question 5;

(5) AND answered any subpart of Questions 12 OR 13 with a number greater than zero.

Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

## QUESTION 15

Do you find by clear and convincing evidence that the harm to Michael Mercieca resulted from malice or gross negligence attributable to Tracy Rummel?

Answer "Yes" or "No."

Answer: _____*Yes*_____

Answer the following question only if you unanimously answered "Yes" to Question 15. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages. Otherwise, you must not answer the following question.

13

## QUESTION 16

What sum of money, if any, if paid now in cash, should be assessed against Tracy Rummel and awarded to Michael Mercieca as exemplary damages, if any, for the conduct found in response to Questions 1 and 2?

Factors to consider in awarding exemplary damages, if any, are—

1. The nature of the wrong.

2. The character of the conduct involved.

3. The degree of culpability of Tracy Rummel.

4. The situation and sensibilities of the parties concerned.

5. The extent to which such conduct offends a public sense of justice and propriety.

6. The net worth of Tracy Rummel.

Answer in dollars and cents, if any.

Answer: $ _10,000_

Answer the following question if you have answered "Yes" to Question 8. Otherwise, do not answer the following question.

## QUESTION 17

Did Microsoft make a good-faith effort to prevent discrimination in its workplace?

Answer "Yes" or "No."

Answer: _____

Answer the following question only if you:

(1) unanimously answered "Yes" to any subpart of Question 8;

(2) OR unanimously answered "Yes" to Question 11

(3) OR unanimously answered "No" to Question 17

(4) AND answered any subpart of Question 14 with a number greater than zero.

Otherwise, do not answer the following question.

14

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

## QUESTION 18

Do you find by clear and convincing evidence that Microsoft Corporation engaged in the discriminatory practice(s) that you have found in answer to Question 8 or 11, with malice or with reckless indifference to the right of Michael Mercieca to be free from such practices?

Answer "Yes" or "No."

Answer: __Yes__

Answer the following question only if you unanimously answered "Yes" to Question 18. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION 19

What sum of money, if any, if paid now in cash, should be assessed against Microsoft Corporation and awarded to Michael Mercieca as exemplary damages, if any, for the conduct found in response to Question 8 or 11?

1. Factors to consider in awarding exemplary damages, if any, are—

2. The nature of the wrong.

3. The character of the conduct involved.

4. The degree of culpability of Microsoft Corporation.

5. The situation and sensibilities of the parties concerned.

6. The extent to which such conduct offends a public sense of justice and propriety.

7. The net worth of Microsoft Corporation.

Answer in dollars and cents, if any.

Answer: $ __9,999,999.24__

9 million 9 hundred 99 99 thousand, 900 999. and twenty Four Cents

15

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

1. Have the complete charge read aloud if it will be helpful to your deliberations;

2. Preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

3. Give written questions or comments to the bailiff who will give them to the judge;

4. Write down the answers you agree on;

5. Get the signatures for the verdict certificate; and

6. Notify the bailiff that you have reached a verdict.

Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

If ten jurors agree on every answer, those ten jurors sign the verdict.

If eleven jurors agree on every answer, those eleven jurors sign the verdict.

If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten, or eleven, who agree on every answer will sign the verdict.

Submitted to the jury the ___5TH___ day of May, 2014, at ___5:56___ o'clock __p__.m.

                     _____
                     Timothy M. Sulak
                     353rd District Court
                     Judge Presiding

16

# CERTIFICATE OF JURY'S VERDICT

Check one:

___✓___ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_Suki M___           _Sukisha Morngat_
Signature of Presiding Juror        Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

(To be signed by those rendering the verdict if the jury is not unanimous.)

Jurors' Signatures                Jurors' Printed Names

1. _____     _____

2. _____     _____

3. _____     _____

4. _____     _____

5. _____     _____

6. _____     _____

7. _____     _____

8. _____     _____

9. _____     _____

10. _____     _____

11. _____     _____

Received from the jury the __7TH__ day of May, 2014, at __3:45__ o'clock __p__.m.

_____
Timothy M. Sulak, Presiding Judge

17

## ADDITIONAL CERTIFICATE

I certify that the jury was unanimous in answering the following questions. All twelve of us agreed to each of the following answers. The presiding juror has signed the certificate for all twelve of us.

Any subpart of Question 1.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

The corresponding subpart of Question 2 to Question 1.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

The corresponding subpart of Question 3 to Question 1.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

The corresponding subpart of Question 4 and the corresponding subpart of Question 5 to Question 1, if required.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

Question 15.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

Question 16.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

Any subpart of Question 8.

_____  
Signature of Presiding Juror

_____Sukisha Moragne_____  
Printed Name of Presiding Juror

18

Question 11.

_____  Sukisha Moragne
Signature of Presiding Juror     Printed Name of Presiding Juror

Question 17.

_____  Sukisha Moragne
Signature of Presiding Juror     Printed Name of Presiding Juror

Question 18.

_____  Sukisha Moragne
Signature of Presiding Juror     Printed Name of Presiding Juror

Question 19.

_____  Sukisha Moragne
Signature of Presiding Juror     Printed Name of Presiding Juror

19

# Tab C

**Findings of Fact and Conclusions of Law**

CAUSE NO. D-1-GN-11-001030

| | | |
|---|---|---|
| MICHAEL MERCIECA, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| Defendant. | § | 353rd JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 21, 2014, this case was called for trial. Plaintiff Michael Mercieca and Defendants Tracy Rummel and Microsoft Corporation appeared in person and through their attorneys and announced ready for trial. On May 5, 2014, the Court submitted liability and damages issues to the jury, which returned a verdict for Plaintiff. Fact issues relating to attorney fees, expert fees, and costs were tried to the Court on July 25 and September 5, 2014. The Court rendered a final judgment for Plaintiff on October 2, 2014.

With respect to attorney fees, expert fees, costs, and other issues related to rendition of the Court's final judgment, the Court makes the following findings of fact by a preponderance of the evidence and issues the following conclusions of law.

### FINDINGS OF FACT

1. The evidence supports a lodestar attorney fee in the amount of $795,505.98 for legal services provided to Plaintiff through rendition of the final judgment on October 2, 2014.

2. The evidence supports an upward adjustment to the lodestar by a multiplier of 1.25 (an additional $192,376.50) to reach a reasonable fee for legal services provided to Plaintiff through rendition of the final judgment on October 2, 2014.

3. The sum of $76,000.00 is a reasonable attorney fee for legal services provided to Plaintiff if this case is successful on appeal to the Court of Appeals.

1778

4. The sum of $7,500.00 is a reasonable attorney fee for legal services provided to Plaintiff if Plaintiff is successful following oral argument in the Court of Appeals.

5. The sum of $6,000.00 is a reasonable attorney fee for legal services provided to Plaintiff if Plaintiff is successful following a motion for rehearing/for en banc reconsideration in the Court of Appeals.

6. The sum of $30,000.00 is a reasonable attorney fee for legal services provided to Plaintiff if Plaintiff is successful following a petition for review with the Supreme Court of Texas.

7. The sum of $30,000.00 is a reasonable attorney fee for legal services provided to Plaintiff if Plaintiff is successful at the Supreme Court of Texas following briefing on the merits.

8. The sum of $15,000.00 is a reasonable attorney fee for legal services provided to Plaintiff if Plaintiff is successful following oral argument in the Supreme Court of Texas.

9. The sum of $6,000.00 is a reasonable attorney fee for legal services provided to Plaintiff if Plaintiff is successful following the Supreme Court of Texas' requests for a response to any motion for rehearing.

10. The sum of $16,060.00 is a reasonable fee for services provided to Plaintiff by experts Brad Coffey, Thomas Glass, and Joel Fleschman.

11. The evidence supports taxing traditional court costs to Defendant Microsoft Corporation in the sum of $21,229.30.

12. The evidence supports assessing additional costs of $5,963.12 to Defendant Microsoft Corporation pursuant to an agreement of the parties or as costs recoverable under Texas Labor Code Section 21.259.

13. Any finding of fact that is more properly characterized as a conclusion of law shall be considered a conclusion of law.

2

1779

## CONCLUSIONS OF LAW

1. Plaintiff was the prevailing party in this lawsuit.

2. Texas Labor Code Section 21.259 allows the Court to award Plaintiff a reasonable attorney fee as part of the costs.

3. Attorney fees to be awarded under Texas Labor Code Section 21.259 may be determined according to the lodestar method.

4. The Court has discretion to apply a multiplier and enhance the lodestar figure to arrive at a reasonable attorney fee.

5. Texas Labor Code Section 21.259 allows the Court to award Plaintiff reasonable expert fees.

Signed this 4TH day of November, 2014.

_____
The Honorable Tim Sulak
Judge Presiding

3

1780

APPROVED AS TO FORM ONLY:

PAUL T. MORIN, P.C.
503 W. 14th Street
Austin, Texas 78701
Tel. (512) 499-8200
Fax. (512) 499-8203


By:_____
        Paul T. Morin
        State Bar No. 14460550
        pmorin@austin.rr.com
*Trial Counsel of Record for Plaintiff*

Roy A. Pollack
Law Offices of Roy A. Pollack
Texas Bar No. 16092900
503 W. 14th Street
Austin, Texas 78701
Tel. (512) 472-6381; Fax (512) 499-8203
*Trial Counsel of Record for Plaintiff*

D. Todd Smith
State Bar No. 00797451
SMITH LAW GROUP, P.C.
1250 Capital of Texas Highway South
Three Cielo Center, Suite 601
Austin, Texas 78746
(512) 439-3230
(512) 439-3232 (fax)
todd@appealsplus.com
*Appellate Counsel for Plaintiff*


_____
Eric J.R. Nichols
State Bar No. 14994900
Gretchen S. Sween
State Bar No. 24041996
Kate Skagerberg
State Bar No. 24058578
BECK REDDEN LLP
515 Congress Ave., Suite 1750
Austin, Texas 78701
*Attorneys for Defendant Microsoft Corporation*

4

1781

# Tab E

**Internal HR Submission styled "Formal Complaint of Michael Mercieca," dated April 19, 2010 (18RR:MSFT90)**

**To:** Dan Shea (HR)[Daniel.Shea@microsoft.com]
**Cc:** Michael Mercieca[michmer@microsoft.com]
**From:** Michael Mercieca
**Sent:** Mon 4/19/2010 6:39:35 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** RE: Still not letting me open the document...
**Categories:** Internal

<u>Formal Complaint from Michael Mercieca.docx</u>

Ok try this.


My apologies.



**Michael Mercieca**

**Microsoft US Partner Group - South Central OEM Team**

<u>michmer@microsoft.com</u>

**512-795-5366 wk**

**512-795-5301 fax**

**512-779-8646 mb**

 And I'm running Windows 7!
                              **Win7 Signature**


bing <u>cid:image001.png@01C9E9D8.8C022B90l</u> bing .... so go bing

Exhibit

**MSFT 090**

**From:** Dan Shea (HR)
**Sent:** Monday, April 19, 2010 1:38 PM
**To:** Michael Mercieca
**Subject:** Still not letting me open the document...

Michael,

I have tried to open but it still says I do not have permission. Can you re-send or adjust the rights restriction. Thanks,

**Dan Shea**

**HR Manager - ER Investigations**

**Employee Relations Investigations Team (ERIT)**

**(425) 538-4011    x84011**

daniel.shea@microsoft.com

MS00159

## Formal Complaint from Michael Mercieca

It is with a deep sense of sadness, much trepidation and soul searching, and after many conversations with HR & LCA, that I find myself with no alternative other than to lodge a formal complaint with Microsoft.

This complaint is based on situations, discussions and experiences which have occurred over the past 5 months following an event at one of my partners, Bass Computers, on November 5th / 6th 2009 and the most recent occurrence April 14th/15th with my manager, which I see as the tipping point.

A string of events began following an informal discussion I understand took place between Tracy Rummel and my direct manager Lori Aulds, whilst they spent weekend together as friends following the above mentioned event.

Unknown to me until February 2010, this led to an escalation within HR of a claim of inappropriate actions/ comments I was alleged to have made towards Ms. Rummel and this was also escalated to many if not all of the US OEM management team. (To this day I do not know specifically what these allegations are).

I was unaware of the discussion between Tracy and Lori until I felt so concerned and uncomfortable for approximately 3 months and I requested a meeting with my manager to bring my concerns to her attention.

In this meeting, which took place Monday February 22nd, I voiced my concerns about a conversation Ms. Rummel and I had Monday 9th November 2009, where she stated comments had been made to her by people at the event about my behavior and it concerned her. Her comments were vague and didn't disclose either specifically what I was supposed to have done or who had raised the issues with her, despite my asking her numerous times. Ms Rummell also confirmed many times that our conversation was between her and I and no further action or investigation was required on my part.

My manager then confirmed:

1. Ms Rummel had stayed at her home that weekend as friends, (Sunday November 8th), and had spoken to her about this.
2. That my manager had directed Ms Rummel to talk to me which she did the following day – albeit under the guise of a private conversation. Clearly this was not true.
3. My manager had escalated this to Marc Pisan, Tracy's manager and he subsequently escalated it to HR. I have since confirmed that my manager actually escalated to HR.
4. My manager also confirmed that the management team knew about this, specifically:
    a. Marc Pisan
    b. Glen Hoagland
    c. David Tannenbaum
    d. Eddie O'Brien
5. My manager also confirmed that Ms Rummel was given the option to file a formal complaint which she declined to do

On hearing this information, I stated to my manager that my thoughts; feelings and experiences over the past few months now made sense and the negativity and change in behavior by my management team was related to this "informal" complaint. My manager stated explicitly that what I was sensing was "probably due to the allegation Tracy had made"

This was of course extremely upsetting to me. At no time was I ever consulted about this by anyone. We had an off-site in December 7th -10th where all the mangers were present as was Micky Shields from HR and no one took me to one side to discuss this. I felt a sense of marginalization at that event but at the time never put the connection together.

MS00160

Had the situation not gotten so uncomfortable for me and I had not taken the risk of raising the issue to my manager in February, I would never have known about this and that any allegations had been made and an escalation had occurred.

I believe that over the past 5 months, I have become a victim of a malicious baseless rumor which has assassinated my character and marginalized my role on the US Local OEM Team.

My reputation within the management structure has been tainted and as a result there have been many instances, for which I have evidence, that certain aspects of Microsoft Standards of Business Conduct ; Company Guidelines and Policies; and Microsoft Corporate Values have been breached and compromised including but not limited to:

1. A lack of common sense and good judgment
2. Lack of integrity & dishonesty
3. Misleading; misrepresentative and derogatory comments
4. Conflicts of interest
5. Increasing negativity towards me constituting harassment

I am deeply saddened and upset by this sequence of events. A baseless rumor has escalated, unknown to myself, throughout the management structure and HR, which I believe is the catalyst for the treatment I have been subjected to.

I love my job and have spent almost 16 years, holding myself to both the high values and greater global purpose of Microsoft; and the higher standards of conduct and professionalism I hold for myself.

I feel that I am being treated as a management performance issue, despite the fact that a preponderance of evidence exists that supports an exemplary performance throughout my tenure at Microsoft and in the US OEM team. My YTD performance stands at 114% of budget with a forecast deviation of only 3.9%; my Q4 forecast is projected to be 140% of budget and my FY11 year performance is projected to finish at 117% of budget.

As for my customers and partners, their feelings towards me can only be described at minimum as highly positive. I see, and have always seen, my role and advocacy of Microsoft as a privilege and honor I hold dear. An important part of that are my reputation and values which are the foundation of everything I do. My peers have described me as the "quintessential epitome of what Microsoft stands for and a Microsoft corporate guy"

Despite this situation, I continue to work hard as a seasoned and senior member of the team and execute my role and responsibilities to the highest standards of responsibility and accountability.

I feel a deep sense of responsibility to my customers; partners; the management team and particularly to my colleagues across the country whom have come to rely on me for coaching; motivation; advice and support over and above my role, based on my experience and desire to help and make others great.

With that in mind, I sincerely and with the utmost respect request that LCA and HR fully investigate this complaint and the circumstances that have compelled me to lodge it.

I am very fearful of what this may do to my career and I do this at great risk to my standing and lodging this complaint is very upsetting to me. I am confused, dismayed and do not understand why I am being marginalized and being treated as a performance issue and part of my objective in lodging this complaint, is to seek the truth and create an environment of transparency.

I am confident that the result will be a complete exoneration of fault on my part. I also hope that this mistreatment; negativity and harassment will stop and my former stellar reputation, which has been impugned, will be restored. I hope that I can continue to work in a professional and healthy environment, within which I am able to represent this great company and team in the exemplary professional fashion, and with the utmost passion that I have consistently displayed since joining Microsoft in 1994.

MS00161

# Tab F

**Employee Relations Investigations Intake Form, dated May 10, 2010 (18RR:MSFT108)**

**To:** ERIT-SMSG[eritsmsg@microsoft.com]
**From:** Micky Shields
**Sent:** Tue 5/11/2010 2:06:25 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Intake form
**Categories:** Internal

**ERIT_IntakeForm.doc**

I've attached an ERIT intake form for your review and action.


Thanks.


Micky


Micky Shields/HRBP Manager/ US SMS&P and OEM/ *Microsoft*

425-703-1902

Exhibit

MSFT 108

## EMPLOYEE RELATIONS INVESTIGATIONS INTAKE FORM

| | |
|---|---|
| **Date** | 5/10/10 |
| **HR Business Partner** | MICKY SHIELDS |
| **Source of allegation(s)** *(e.g. Employee, Manager, HRBP (peer), Diversity Consultant, Benefits, Security, Legal, etc.)* | HRBP |
| **Date source appraised of allegation(s)** | MAY 7, 2010 |
| **Summary of allegation as stated by complaining party, including supporting facts/incidents.** *(Attach any supporting documentation provided by Complainant.)* | Michael Mercieca made advances towards Tracy including asking her to stay at his home when she was in town for business and talking to her about sex. In working together with a partner account, they arranged for a dinner prep meeting with the partner and when Tracy arrived for dinner, the partner was not there, just Michael. Michael made this sound like it was a date. Tracy talked to Michael about this and he apologized. Within days of the dinner, the partner told Tracy that she was not adding any value and didn't want to have her participating on the account. Tracy is continues to be concerned that Michael's relationship with the partner and her asking him to stop making advances is now impacting her work relationship with the partner. |
| **Complainant(s)/Level/Title/Org** *(Person raising allegation)* | TRACY RUMMEL/L63/SENIOR MARKETING MANAGER/OEM |
| **Subject(s)/Level/Title/Org** *(Person who is the subject of the allegation)* | MICHAEL MERCIECA/L63/OEM ACCOUNT MANAGER/OEM |
| **Potential witnesses** *(Title, Group and Org)* | |
| **HR advice given** *(if any)* | MICROSOFT TAKES THIS SERIOUSLY AND WE WILL FOLLOW UP WITH YOU ABOUT NEXT STEPS. |

# Tab G

**Internal HR Submission styled "Supplementation," dated June 9, 2010
(18RR:MSFT121)**

LAW OFFICE OF
## ROY A. POLLACK
503 WEST 14TH STREET
AUSTIN, TEXAS 78701

TEL (512) 472 6381
FAX (512) 499-8203

June 9, 2010

*Via email: micshi@microsoft.com*

Microsoft Corporation
ATTN: Micky Shields (HR)

*Via email: Daniesh@microsoft.com*

Microsoft Corporation
ATTN: Dan Shea (ERIT)

*Via email: ERIT@microsoft.com*

Microsoft Corporation
ATTN: Employee Relations Investigation Team

RE: Michael Mercieca

To Whom It May Concern:

As you know, I represent Michael Mercieca regarding his *Formal Complaint*, filed with Microsoft Human Resources. Please consider this correspondence a supplementation to Mr. Mercieca's original *Formal Complaint* (lodged on April 19, 2010—attached hereto for your convenience) This supplementation is intended to bypass the emotional tone of Mr. Mercieca's original complaint--due, understandably, to his dedication to Microsoft coupled with Microsoft's inexplicable treatment of him--and to set out in no uncertain terms the serious nature of Mr. Mercieca's situation.

Mr. Mercieca is formally complaining about Microsoft's harassing, discriminatory, and retaliatory conduct based on his gender and national origin, which has surfaced since approximately November, 2009.

Mr. Mercieca is formally complaining about sexual harassment in the workplace.

1

**Exhibit**

**MSFT 121**

MER 001321


No. 138
Date 8-13-13
Shields
C C Reporting

Moreover, Mr. Mercieca is formally complaining about the conflict of interest that exists between Lori Aulds, his direct manager, and Tracy Rummel's, a former contractor and newly hired employee, who is a close friend of Ms. Aulds

Mr. Mercieca is formally complaining about the patent breach of confidentiality, in addition to the breach of personnel information that has occurred between, among others, Lori Aulds and Tracy Rummel, prior to Ms. Rummel's hiring by Microsoft.

Mr. Mercieca is formally complaining about Microsoft's steady course of retaliation pertaining to various aspects of his employment with Microsoft.

Mr. Mercieca is also complaining about the hostile work environment that has surrounded him since the undisclosed allegations pertaining to him started to covertly spread throughout the infrastructure of Microsoft.

Microsoft represents to its employees that it "strongly supports an open door policy for resolving problems quickly and fairly." Yet in the situation at hand, Microsoft has constructively ignored the formal complaint of its loyal employee of 16 years (Michael Mercieca), while wholly embracing the suspect complaint, tainted with retaliation, by a newly hired employee (Tracy Rummel). Approximately seven (7) weeks has passed since Mr. Mercieca's initial *Formal Complaint* and virtually nothing has been done to inform him as to what allegations have specifically been made and/or to ascertain his account of events in relation to such specific allegations. As of June 8th, Ms. Shields is just "getting back to" Mr. Mercieca under the email heading which aptly summarizes Microsoft's continued inaction to minimize Mr. Mercieca's situation, "Follow-up on your concern."

One would hope that after employing such an outstanding employee, representative, and ambassador, Microsoft would *know* Michael Mercieca after 16 years of service. To that end, the most important thing to Mr. Mercieca is his name and reputation. It is paramount to him that he is cleared of any and all accusations and that his reputation is wholly restored. We sincerely hope that Microsoft will start to address Mr. Mercieca's complaint with the attention that it deserves.

Sincerely,


Roy A. Pollack



cc: Michael Mercieca

2

MER 001322

## Formal Complaint from Michael Mercieca

It is with a deep sense of sadness, much trepidation and soul searching, and after many conversations with HR & LCA, that I find myself with no alternative other than to lodge a formal complaint with Microsoft.

This complaint is based on situations, discussions and experiences which have occurred over the past 5 months following an event at one of my partners, Bass Computers, on November 5th / 6th 2009 and the most recent occurrence April 14th/15th with my manager, which I see as the tipping point.

A string of events began following an informal discussion I understand took place between Tracy Rummel and my direct manager Lori Aulds, whilst they spent weekend together as friends following the above mentioned event.

Unknown to me until February 2010, this led to an escalation within HR of a claim of inappropriate actions/ comments I was alleged to have made towards Ms. Rummel and this was also escalated to many if not all of the US OEM management team. (To this day I do not know specifically what these allegations are).

I was unaware of the discussion between Tracy and Lori until I felt so concerned and uncomfortable for approximately 3 months and I requested a meeting with my manager to bring my concerns to her attention.

In this meeting, which took place Monday February 22nd, I voiced my concerns about a conversation Ms. Rummel and I had Monday 9th November 2009, where she stated comments had been made to her by people at the event about my behavior and it concerned her. Her comments were vague and didn't disclose either specifically what I was supposed to have done or who had raised the issues with her, despite my asking her numerous times. Ms Rummell also confirmed many times that our conversation was between her and I and no further action or investigation was required on my part.

My manager then confirmed:

1. Ms Rummel had stayed at her home that weekend as friends, (Sunday November 8th), and had spoken to her about this.
2. That my manager had directed Ms Rummel to talk to me which she did the following day – albeit under the guise of a private conversation. Clearly this was not true.
3. My manager had escalated this to Marc Pisan, Tracy's manager and he subsequently escalated it to HR. I have since confirmed that my manager actually escalated to HR.
4. My manager also confirmed that the management team knew about this, specifically:
   a. Marc Pisan
   b. Glen Hoagland
   c. David Tannenbaum
   d. Eddie O'Brien
5. My manager also confirmed that Ms Rummel was given the option to file a formal complaint which she declined to do.

On hearing this information, I stated to my manager that my thoughts; feelings and experiences over the past few months now made sense and the negativity and change in behavior by my management team was related to this "Informal" complaint. My manager stated explicitly that what I was sensing was "probably due to the allegation Tracy had made."

This was of course extremely upsetting to me. At no time was I ever consulted about this by anyone. We had an off-site in December 7th -10th where all the mangers were present as was Micky Shields from HR and no one took me to one side to discuss this. I felt a sense of marginalization at that event but at the time never put the connection together.

MER 001323

Had the situation not gotten so uncomfortable for me and I had not taken the risk of raising the issue to my manager in February, I would never have known about this and that any allegations had been made and an escalation had occurred.

I believe that over the past 5 months, . have become a victim of a malicious baseless rumor which has assassinated my character and marginalized my role on the US Local OEM Team.

My reputation within the management structure has been tainted and as a result there have been many instances, for which I have evidence, that certain aspects of Microsoft Standards of Business Conduct ; Company Guidelines and Policies; and Microsoft Corporate Values have been breached and compromised including but not limited to:

1. A lack of common sense and good judgment
2. Lack of integrity & dishonesty
3. Misleading; misrepresentative and derogatory comments
4. Conflicts of Interest
5. Increasing negativity towards me constituting harassment

I am deeply saddened and upset by this sequence of events  A baseless rumor has escalated, unknown to myself, throughout the management structure and HR, which I believe is the catalyst for the treatment I have been subjected to.

I love my job and have spent almost 16 years, holding myself to both the high values and greater global purpose of Microsoft; and the higher standards of conduct and professionalism I hold for myself.

I feel that I am being treated as a management performance issue, despite the fact that a preponderance of evidence exists that supports an exemplary performance throughout my tenure at Microsoft and in the US OEM team. My YTD performance stands at 114% of budget with a forecast deviation of only 3 9%; my Q4 forecast is projected to be 140% of budget and my FY11 year performance is projected to finish at 117% of budget.

As for my customers and partners, their feelings towards me can only be described at minimum as highly positive.  I see, and have always seen, my role and advocacy of Microsoft as a privilege and honor I hold dear. An important part of that are my reputation and values which are the foundation of everything I do. My peers have described me as the "quintessential epitome of what Microsoft stands for and a Microsoft corporate guy."

Despite this situation, I continue to work hard as a seasoned and senior member of the team and execute my role and responsibilities to the highest standards of responsibility and accountability.

I feel a deep sense of responsibility to my customers; partners; the management team and particularly to my colleagues across the country whom have come to rely on me for coaching; motivation; advice and support over and above my role, based on my experience and desire to help and make others great.

With that in mind, I sincerely and with the utmost respect request that LCA and HR fully investigate this complaint and the circumstances that have compelled me to lodge it.

I am very fearful of what this may do to my career and I do this at great risk to my standing and lodging this complaint is very upsetting to me.  am confused, dismayed and do not understand why I am being marginalized and being treated as a performance issue and part of my objective in lodging this complaint, is to seek the truth and create an environment of transparency.

I am confident that the result will be a complete exoneration of fault on my part. I also hope that this mistreatment; negativity and harassment will stop and my former stellar reputation, which has been impugned, will be restored. I hope that I can continue to work in a professional and healthy environment, within which I am

MER 001324

able to represent this great company and team in the exemplary professional fashion, and with the utmost passion that I have consistently displayed since joining Microsoft in 1994.

MER 001325

# Tab H

**Plaintiff's Third Amended Petition (CRS499-519)**

Filed
13 April 12 P9:50
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-11-001030

NO. D-1-GN-11-001030

| | | |
|---|---|---|
| MICHAEL MERCIECA, | § | IN THE DISTRICT COURT |
| **Plaintiff** | § | |
| | § | |
| vs. | § | 353rd JUDICIAL DISTRICT |
| | § | |
| TRACEY RUMMEL, and | § | |
| MICROSOFT CORPORATION, | § | |
| **Defendants.** | § | TRAVIS COUNTY, TEXAS |

## PLAINTIFF'S THIRD AMENDED PETITION

## TO THE HONORABLE JUDGE OF THIS COURT:

**NOW COMES** Michael Mercieca, hereinafter called Plaintiff, and files this Amended Petition complaining of and about Tracey Rummel, individually, and Microsoft Corporation, hereinafter called Defendants, and for cause of action shows unto the Court the following:

### I.    DISCOVERY CONTROL PLAN LEVEL

Plaintiff intends that discovery be conducted under Discovery Level 3.

### II.    PARTIES AND SERVICE

1.    Plaintiff, Michael Mercieca, is an individual who resides in Travis County, Texas.

2.    Defendant, Tracey Rummel, is an individual and resident of Harris County, Texas and has appeared and answered herein.

3.    Defendant, **MICROSOFT CORPORATION**, is a Washington State corporation authorized to do business and doing business in the State of Texas at all relevant times hereto, and has appeared and answered herein.

### III.    JURISDICTION AND VENUE

4.    The subject matter in controversy is within the jurisdictional limits of this court.

5.    This court has jurisdiction over the parties because Plaintiff and the individual

1

Defendant are both Texas residents, and some or all of the employees and agents of Microsoft Corporation that committed the acts described below work and reside in Travis County, Texas. Additionally, Microsoft Corporation has four offices within the State of Texas, located in Austin, Dallas, Houston and San Antonio.

6. Venue in Travis County is proper in this cause under the mandatory venue provision §15.017 of the Texas Civil Practice and Remedies Code because it is the county in which Plaintiff resided at the time of the accrual of Plaintiff's slander cause of action. Under such Code §15.004 and 15.005, venue for all of Plaintiff's other causes of action also lies in Travis County because such other causes of action arise out of the same transaction, occurrence or series of transactions or occurrences as Plaintiff's slander cause of action.

Alternatively, venue in Travis County is proper under the general venue provision of Code §15.002(a) (1) because it is the county in which all or a substantial part of the events or omissions giving rise to Plaintiff's claim occurred.

## IV.  FACTS

7. Plaintiff is an individual residing in Travis County, Texas. He turned 50 years of age as of his birthday on August 22, 2010. He was born in London, England, has British, Australian and New Zealand citizenship status, and became a nationalized USA citizen in September 2010. Plaintiff was a Senior Sales Executive for Microsoft Corporation and wasa employed with Microsoft around the globe for 17 years. Plaintiff consistently excelled with over quota sales performance to much critical acclaim. Plaintiff received awards and much positive feedback from Microsoft for his customer service and sales excellence and was widely recognized by his customers, partners, and his peers as one of the most passionate advocates for Microsoft and one of the most generous, compassionate, and supportive team players. Plaintiff was acknowledged

2

500

as a leader amongst his peers- he was a loyal, selfless, and inspiring friend and colleague and recognized as the very embodiment of integrity. During his time at Microsoft, Plaintiff received a number of Sales Recognition Awards, Long Service Awards and Customer Service Awards and was the first recipient of the Sales District "Spirit of the District Award" at Microsoft. In addition, Plaintiff received numerous letters and e-mails of commendation from Microsoft partners and customers, and from his peers and colleagues.

8.      In or about September or October 2007, Lori Aulds, a Microsoft employee, became Plaintiff's direct manager. Plaintiff and Ms. Aulds had had a sexual relationship over a period of years prior to her promotion as Plaintiff's direct manager. Plaintiff had ended such relationship some time prior to Ms. Aulds's promotion to his manager. Ms. Aulds remained Plaintiff's direct manager until in or about December 2010.

9.      Defendant Rummel was an independent contractor hired through Xtreme Consulting to work for Microsoft as a contingent staffer "CS" and marketing consultant from on or about November 2008 through on or about February 15, 2010. In February 15, 2010, she was hired by Microsoft as a full-time employee. Prior to being hired by Microsoft, Ms. Rummel had such a close personal relationship with Ms. Aulds that they spent overnights together either at Ms. Aulds' home or while away on business. In or about November 8, 2009, Ms. Rummel and Ms. Aulds spent the night together and allegedly Ms. Rummel advised Ms. Aulds that she was subjected to sexual harassment comments and actions by Mr. Mercieca. Until Plaintiff filed this suit and conducted discovery, Plaintiff had not been told the substance of the actual allegations made by Ms. Rummel to Ms. Aulds in November 8, 2009. Based upon information and belief, Ms. Rummel, in this conversation with Ms. Aulds during this sleepover, *accused Plaintiff of sexually harassing her*. However, any statement made by Ms. Rummel to Ms. Aulds in or about November 8, 2009

3

501

*accusing Plaintiff of "sexual harassment"* was never communicated to Plaintiff by anyone, including by Ms. Rummel, until after Ms. Rummel's deposition was taken after this suit was filed.

10. It is undisputed that Ms. Rummel was not an employee of Microsoft in November of 2009 and that Ms. Aulds was not a member of Microsoft's Human Resources at all times relevant to this suit.

11. Thereafter, in late 2009 and early 2010, Ms. Aulds began to unduly scrutinize and criticize Plaintiff relative to his job performance and to discriminate against him in her treatment of him as an employee versus the treatment received from her by other employees that she supervised. Plaintiff met with Ms. Aulds in or about February 2010 to discuss his concerns over such treatment, and his concerns about the hiring of Ms. Rummel since Plaintiff had heard complaints from Microsoft partners/customers about Ms. Rummel. Ms. Aulds discouraged Plaintiff from going to Human Resources with such concerns. Ms. Aulds specifically told Plaintiff that Ms. Rummel had not filed any complaint against him. Ms. Aulds advised Plaintiff for the first time that Tracy Rummel had related complaints of sexual harassment to her and that she had advised Human Resources. In or about November of 2009, although Micky Shields told Ms. Aulds that the matter was not an Human Resources issue since no complaint had been raised and no one had contacted her about any facts or complaint and that the matter would be closed and confidential, Ms. Aulds took it upon herself to republish the false allegations made by Tracy Rummel and she passed it on to her boss David Tannebaum and then to his boss Eddie Obrien.

12. After the false allegations were passed on to Mr. Mercieca's upper management by Lori Aulds, Plaintiff began to be treated differently by his manager and upper management. On or about April 19, 2010, Plaintiff filed a complaint against Lori Aulds and other managers with Microsoft's Human Resources department, complaining of harassment, hostile work environment, and

4

discrimination based on sex, age and national origin. From that point on, Microsoft's mistreatment and discriminatory treatment of Plaintiff intensified to include but not be limited to, a bad faith investigation by was performed on Plaintiff's formal complaint.

13. Ms. Aulds's mistreatment and discriminatory actions towards Plaintiff included, without limitation, the following actions or omissions, some of which occurred after Plaintiff filed his complaint with Microsoft Human Resources:

a. Ms. Aulds did not have one-to-one meetings with Plaintiff in the same amount and same frequency that she had with other employees she supervised;

b. She urged Plaintiff to apply for a transfer within Microsoft to a position in Europe or Australia/New Zealand, and to Plaintiff's knowledge, never recommended him for a promotion to a position in the United States;

c. She cut his expense budget when other employees similarly situated to Plaintiff did not have their expense budgets cut;

d. She prohibited him from attending important meetings, and important conferences which he had attended in previous years, that were necessary for Plaintiff to maintain good relationships with his Microsoft accounts, whereas other employees she supervised who were younger than Plaintiff or less experienced than Plaintiff, or had been employed for less time with Microsoft than Plaintiff, were allowed to attend such conferences and meetings;

e. She met and talked with Plaintiff's account customers without Plaintiff's knowledge and participation to discuss their accounts and to try and obtain adverse information about Plaintiff;

f. She promised to support Plaintiff's request for a promotion, but then failed

5

503

to do so;

g.    She deliberately failed to forward to Plaintiff communications from his customer accounts;

h.    She falsely accused Plaintiff of expense irregularities;

i.    She unduly scrutinized and questioned his request for vacation time;

j.    She failed to recognize project accomplishments of Plaintiff while recognizing the accomplishments of other employees she supervised;

k.    She failed to assign lead roles to Plaintiff that should have been assigned to him and that were assigned to similarly situated employees;

l.    She made disparaging comments about Plaintiff's nation of origin and questioned his green card status and right to work for Microsoft;

k.    She falsely accused Plaintiff of improper office behavior; and,

l.    She conspired with David Tannebaum to give Mr. Mercieca a bad final review, which ultimately David Tannebaum used to demote Mr. Mercieca to a level 5 OEM team member when his manager at the time, Joe Sahagian, recommended Mr. Mercieca to a level 3.

14.    Ms. Aulds has admitted to Plaintiff that she could not handle her relationship to Plaintiff as his boss and insisted that Plaintiff look for another job.

15.    During Microsoft Human Resource's official investigation of Plaintiff's complaint, Ms. Aulds lied to the investigator, Dan Shea, and said that she had not had a prior sexual relationship with Plaintiff in order to show Plaintiff as a liar. The lies Ms. Aulds told were key to the investigation. Even though Microsoft subsequently became aware of Ms. Aulds lies during an official investigation, Microsoft subsequently promoted Ms. Aulds and demoted Mr. Mercieca. While the investigation was still ongoing David Tannebaum demanded the investigation end before

6

it was completed and before all of Mr. Mercieca's supporting witnesses were contacted.

16.. At or about the same time that Ms. Aulds was engaging in the above-described behavior towards Plaintiff, other Microsoft managers engaged in similar mistreatment and discriminatory treatment of Plaintiff including, without limitation, the following acts and omissions, some of which occurred after Plaintiff filed his complaint with Microsoft Human Resources:

a. Plaintiff was chastised by manager David Tannebaum for missing a deadline by three hours, when other employees were not chastised for missing deadlines by such short time frames;

b. Plaintiff was accused by manager David Tannenbaum of not performing his job adequately because of the length of time he remained at a certain grade whereas other similarly situated employees were not similarly criticized;

c. Plaintiff did not receive promotions which he should have received and which were awarded to similarly situated employees and to American employees;

d. Microsoft delayed its investigation and engaged in a bad faith investigation of Plaintiff's complaint;

e. Microsoft's Human Resources summarily dismissed Plaintiff's complaint without speaking to Plaintiff;

f. Microsoft reported to Plaintiff that it had found no basis for his complaint;

g. Microsoft promoted Ms. Aulds, even after discovering that she had lied during the investigation of Plaintiff's complaint;

h. In announcing the promotion of Ms. Aulds, Manager Eddie O'Brien emphasized her gender;

i. Microsoft managers, including without limitation, Ms. Aulds, David

7

505

Tannenbaum, and Eddie O'Brien, communicated with Plaintiff's customer accounts without Plaintiff's knowledge and participation to discuss their accounts which marginalized Plaintiff's position with his accounts;

j. Microsoft managers, including without limitation, Ms. Aulds and David Tannenbaum, communicated with Plaintiff's customer accounts without Plaintiff's knowledge and participation to try and obtain adverse information about Plaintiff;

k. Microsoft managers, including without limitation, David Tannenbaum, made job assignments that discriminated against Plaintiff and one other person of approximately the same age as Plaintiff;

l. In Plaintiff's annual review conducted by Microsoft in or about August 2010, he received a vastly reduced pay raise even though his performance numbers were better than the previous year. He also received a bonus and stock options that were 70% lower than the previous year even though his performance numbers placed him among the top six sales representatives. Another sales representative of approximately the same age as Plaintiff also received reduced compensation during the same annual review. An American sales representative who finished towards if not at the bottom of the sales representatives in terms of performance numbers and who is far younger and less experienced than Plaintiff received the same rating as Plaintiff—"achieved"—even though he did not achieve his performance quota. Plaintiff believes that this younger, less experienced, and under achieving sales representative received similar or more generous compensation as Plaintiff during the August 2010 annual review. During Plaintiff's 2010 annual review, which was attended by two managers and a human resources representative, Microsoft raised

8

unsubstantiated and unsupported claims of negative job performance as a pretext for Plaintiff's reduced compensation increases. To Plaintiff's knowledge, no other sales representative was "ganged up" on in this manner;

m.     Microsoft increased its scrutiny of Plaintiff's job performance and work product to an extent that exceeded the scrutiny of similarly situated employees or of younger, less experienced employees, and to such an extent that Plaintiff's customer accounts have told him that they fear they will suffer adverse consequences if they support Plaintiff;

n.     Plaintiff was prohibited from attending a key conference with customers, which then resulted in Plaintiff being left out of subsequent meetings with his customer accounts. Instead of attending the conference, Plaintiff was required to attend a six hour internal training program;

o.     Microsoft manager Eddie O'Brien prohibited Plaintiff from attending a sales meeting with one of Plaintiff's customer accounts even though other, younger American employees are allowed to attend the sales meetings where senior executives at Microsoft meet with their customer accounts;

p.     Job anniversary milestones and project accomplishments of other employees are recognized by Microsoft, but Plaintiff does not receive such recognition for his anniversary milestones or project accomplishments;

q.     Constructive criticism offered by Plaintiff concerning Microsoft services or products, which in the past was readily accepted by Microsoft managers, is now treated as evidence of Plaintiff's alleged "bad attitude" concerning his job;

r.     Plaintiff was forced to perform duties that were clearly too much for one

9

person to perform;

s.     Disparaging comments were made about Plaintiff's nation of origin. One of the managers, Eddie O'Brien, is known throughout the company, for his disparaging comments about different nationalities, including one time when shortly after the recent tsunami in Japan, he said that "I would have zero pity for Japan. I would push them right under the bus and create another tsunami;" and,

t.     At off-site gatherings of Microsoft employees Plaintiff was ostracized by Microsoft managers, whereas the same managers were clearly engaging socially with other employees.

17.     Within approximately 18 days of Plaintiff filing his complaint with Microsoft Human Resources, Plaintiff was notified by Microsoft, on or after May 12, 2010, that a Microsoft employee had filed a complaint against him. Plaintiff subsequently learned, on or about June 17, 2010, that Defendant Tracy Rummel had filed a sexual harassment complaint and retaliation complaint against him with Microsoft Human Resources, alleging that Plaintiff had been sexual harassing her for approximately from on or about November 8, 2008 through November 9, 2009.

18     Despite Ms. Rummel's claim of sexual harassment by Plaintiff occurring prior to her being employed by Microsoft, she sought to join the very sales team at Microsoft which included Plaintiff.

19.     After this lawsuit was filed and through discovery, Plaintiff learned that Ms. Rummel filed her complaint against him with Microsoft on or about May 7, 2010. Through discovery Plaintiff has learned that Ms. Rummel never contacted anyone at Microsoft Human Resources from November 2009 until she was persuaded to file her complaint against Mr. Mercieca on or about May 7, 2010 by Ms. Aulds. And in retaliation for Mr. Mercieca's complaint against Ms. Aulds.

10

508

20. Microsoft investigated the Ms. Rummel's complaint and found it to be baseless and "unsupported", yet Ms. Rummel received no adverse consequences for engaging in such activity. The only reason Ms. Aulds received any disciplinary conduct was because after she got caught in her lies, she ultimately admitted to the lies, and of course, Microsoft was forced to admonish her.

21. After the onset of the above-described mistreatment and discriminatory treatment, some of Plaintiff's colleagues at Microsoft have noticed changes in Plaintiff's behavior at work, commenting to Plaintiff that he appeared withdrawn during conference calls and did not ask questions and discuss issues in the same manner and with the same enthusiasm as in the past.

22. One colleague whom Plaintiff highly respects has told Plaintiff that it is obvious or clear to him that Microsoft managers are treating Plaintiff differently and negatively, and are attempting to undermine anything that plaintiff says or does.

23. The environment at work has become so intolerable and stressful that Plaintiff could no longer work in Microsoft's Austin office unless it was absolutely necessary to get the job done, preferring to work instead from his home office or at customer's offices. The environment at work continued to be so intolerable and stressful that Plaintiff's employment with Microsoft was constructively terminated on or about February 22, 2012 and as a result of Plaintiff being ordered to be unjustly placed at a level 5.

## V.  RESPONDEAT SUPERIOR AND RATIFICATION

24. Whenever in this complaint it is alleged that the Defendant Microsoft did any act or thing, or failed to do any act or thing, it is meant that the Defendant's officers, agents, servants, employees or representatives did such act with full authorization or ratification of the Defendant, or was done in the normal and routine course and scope of employment of Defendant's officers, agents, servants, employees, or representatives including Tracy Rummel,

509

Marketing Manager, Marc Pisan, Marketing Director U.S. OEM, Lori Aulds, Regional Sales Director U.S. OEM, David Tannebaum National Sales Director U.S. OEM, and Eddie O'Brien, a Vice President U.S. OEM. Whenever it is alleged in this petition that a Microsoft employee did any act or thing or failed to do any act or thing, it is meant that such employee acted or failed to act with full authorization or ratification of Defendant, or was done in the normal and routine course and scope of employment by Defendant, or was done in a capacity or manner that makes Microsoft vicariously liable for such conduct.

## VI.   SLANDER & CONSPIRACY TO SLANDER

25.    Plaintiff adopts and incorporates by reference into this section of his petition the statements set forth above in the Facts section as if set forth in this section.

26.    During the deposition of Tracy Rummels in this case, Plaintiff learned that Defendant Rummels had published false statements to Micky Shields in the Human Resources Department at Microsoft in November 2009 in that she accused Plaintiff of sexually harassing her and of retaliating against her while she was a C.S. (i.e., non-employee) of Microsoft. Rummels's allegations were not investigated by Microsoft at the time. Upon information and belief, Aulds repeated these false allegations of sexual harassment David Tannebaum and Eddie O''Brien.

27.    On or about May 7 or 10, 2010, false statements were published and/or republished by Defendant Rummel in that she accused Plaintiff of sexually harassing her and of retaliating against her while she was a vendor for Microsoft.

28.    Plaintiff asserts the discovery rule.

29.    After Rummel published or republished the false statements in May 2010, her allegations were for the first time investigated by employees of Microsoft and determined to be" unsupported."

12

30. As a result of the false allegations, Plaintiff has been subjected to undue strict scrutiny of his job performance, hostile work environment, continued harassment by Microsoft, retaliation, demotion and constructive discharge.

31. Defendant Microsoft, by and through its officers, agents, servants, employees, or representatives, including, but not limited to, manager, Lori Aulds, acting within the course and scope of her employment or under conditions that make Microsoft vicariously liable for her conduct, conspired with Defendant Rummel, to slander Plaintiff by making false statements of fact referring to Plaintiff, including without limitation, false allegations of sexual harassment and retaliation.

32. The false statements constitute defamation per se because they accuse Plaintiff of engaging in illegal activity and/or sexual misconduct and/or they directly bear on his fitness as a sales agent and businessman and/or they constitute injury to his personal and business reputation and to his occupation and/or impeach his honesty, integrity or virtue. Furthermore, these statements are defamatory because they tend to injure Plaintiff's reputation and occupation in the sales and business community and expose him to public hatred, contempt, ridicule, and financial injury, and impeach his honesty and integrity.

33. The defamatory statements are false, slanderous, and libelous. At all times relevant hereto, Plaintiff was an employee of Microsoft for 17 years and engaged in outside sales. Defendants made, or conspired with each other to make, the defamatory statements with the knowledge that they were false or with substantial grounds for knowing that they might be false and with reckless disregard to whether they were true or false. Alternatively, the defamatory statements were negligently published by Defendants. Upon information and belief, Defendant Rummel published her sexual harassment complaint against Plaintiff at the insistence of Microsoft and in

13

retaliation for Plaintiff filing a complaint against Microsoft.

34. As a direct and proximate result of Defendants' publication of, and/or conspiracy to publish, the defamatory statements, Plaintiff's business sales reputation has been severely injured. The false allegations contained in the defamatory statements have caused Plaintiff to suffer severe mental anguish, public humiliation and embarrassment as a result of Defendants' intentional and/or negligent acts since the truth was known to Defendants. As a direct and proximate result of Defendants' acts, Plaintiff has suffered pecuniary losses, including without limitation, loss of income as a result of his constructive discharge, loss of future income, and loss of employee benefits. Plaintiff seeks compensatory damages for these injuries in an amount that exceeds the minimum jurisdictional limits of this Court.

35. Plaintiff is entitled to exemplary damages from Defendants because they acted with a specific intent to cause injury to Plaintiff or with conscious indifference to the rights, safety, or welfare of Plaintiff and with actual, subjective awareness that their conduct involved an extreme degree of risk of harm to Plaintiff. Plaintiff seeks exemplary damages in an amount not to exceed three times the amount of his actual damages as determined by the fact finder.

36. The publication and republication of the false statements by Defendants was not privileged.

37. Defendants were not acting in good faith in publishing and republishing the statements.

38. Plaintiff did not consent to the publishing or republishing of the false statements about him. Plaintiff sought a fair investigation of his formal complaint yet Microsoft engaged in a bad faith investigation of his complaints in an effort to hide the truth.

512

## VII.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

39.    Plaintiff adopts and incorporates by reference into this section of his petition the statements set forth above in the Facts section as if set forth in this section.

40.    Plaintiff timely filed a charge of discrimination against Defendant Microsoft with the Austin Human Rights Division, a division of the Civil Rights Division of the Texas Workforce Commission ("TWC"), and made a dual filing with the EEOC. Plaintiff exhausted his administrative remedies, received a right to sue letter from the appropriate State agency, and this suit has been timely filed under the Texas Labor Code. All conditions precedent to filing this claim have been performed by Plaintiff or have occurred.

## VIII.    DISCRIMINATION IN VIOLATION OF
## THE TEXAS COMMISSION ON HUMAN RIGHTS ACT

41.    Plaintiff adopts and incorporates by reference into this section of his petition the statements set forth above in the Facts section as if set forth in this section.

42.    During the course of his employment, Defendant Microsoft discriminated against Plaintiff because of age and/or sex and/or national origin.

43.    Specifically, and without limitation, Defendant subjected Plaintiff to undue scrutiny, denied him promotions, denied him bonuses and other compensation, question his green card status and right to work in the United States, subjected him to isolation and ostracized him, undermined him vis-à-vis other employees and his customers, and subjected him to a hostile work environment, retaliation, and/or constructive discharge, based upon his age, sex and/or national origin, or a combination of each.

44.    Through such actions, Defendant Microsoft intentionally discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment, or limited, segregated or classified Plaintiff in a manner that would deprive or tend to deprive

15

him of any employment opportunity or adversely affect his status as an employee, including without limitation, unjustly demoting him to a level 5 when his manager at the time had ranked him at a level 3, resulting in a constructive discharge.

45. Age and/or sex and/or national origin were motivating factors in Defendant Microsoft's treatment of Plaintiff.

46. Such conduct constitutes unlawful employment practices in violation of the Texas Commission on Human Rights Act, including without limitation, Texas Labor Code §21.051 and/or 21.056.

47. Plaintiff was proximately damaged as a result of the conduct of Microsoft, its agents and employees, in an amount within the jurisdictional limits of this court. Plaintiff seeks recovery of such damages, including without limitation, the damages provided by Texas Labor Code Sec. 21.2585.

## IX. SEXUAL HARASSMENT

48. Plaintiff adopts and incorporates by reference into this section of his petition the statements set forth above in the Facts section as if set forth in this section. Additionally, Defendant Aulds, acting within the course and scope of her employment or in a manner that makes Microsoft vicariously liable for her conduct, made sexual comments to Plaintiff about her sex life (such as "you have ruined me for sex with my boyfriends"), commented on her sexual relationships with her boyfriends, and insisted that Plaintiff get involved in her and her boyfriend's relationship and disputes, even though on several occasions Plaintiff told Aulds that it made him uncomfortable being told and involved in these things, and handled her relationship with Plaintiff more like a "boyfriend/girlfriend" relationship rather than an employer/employee relationship.

49. The above-described conduct of Defendant Microsoft's manager employee, Lori

514

Aulds, was sufficiently severe and pervasive so as to alter the conditions of Plaintiff's employment and create an abusive work environment. The accumulated effect of her repeated verbal attacks and caustic comments to and about Plaintiff (which became known to Plaintiff) undermined Plaintiff's ability to succeed at his job, and caused harm to his emotional stability and health. Such gender-based animus exhibited by Ms. Aulds to Plaintiff constitutes sexual harassment of Plaintiff in violation of his rights under the law. Defendant Microsoft knew or should have known of the harassment and abusive work environment, yet failed to take prompt remedial action.

50. Plaintiff alleges that Defendant Microsoft, by and through its manager employee, sexually harassed Plaintiff and created an abusive work environment for Plaintiff with malice or with reckless indifference to the legally protected rights of Plaintiff.

51. Such harassment proximately caused damages to Plaintiff in an amount within the jurisdictional limits of this court.

## X. RETALIATION

52. Plaintiff adopts and incorporates by reference into this section of his petition the statements set forth above in the Facts section as if set forth in this section.

53. Plaintiff alleges that Defendant Microsoft, by and through its officers, agents, servants, employees or representatives, including without limitation, Tracy Rummel, Marketing Manager, Marc Pisan, Marketing Director U.S. OEM, Lori Aulds, Regional Sales Director U.S. OEM, David Tannebaum National Sales Director U.S. OEM, and Eddie O'Brien, a Vice President U.S. OEM instituted a campaign of retaliation against Plaintiff due to Plaintiff filing his formal complaint against Lori Aulds, Regional Sales Director U.S. OEM, David Tannebaum National Sales Director U.S. OEM, and Eddie O'Brien, a Vice President U.S. OEM and

17

515

exercising his rights by filing a charge of discrimination with the Austin Commission on Human Rights, a branch of the Texas Commission of Human Rights, and EEOC. This retaliation included the filing of a bogus sexual harassment and retaliation complaint by Defendant Rummel while employed by Microsoft, and Microsoft causing or encouraging Tracy Rummel to file a false and misleading charge of sexual harassment and retaliation against Plaintiff.

54.     Such conduct violates Texas Labor Code Sec. 21.055 and/or 21.056.

55.     Such conduct proximately caused Plaintiff to suffer damages in an amount within the jurisdictional limits of this court.

## XI.     INVASION OF PRIVACY

56.     Plaintiff adopts and incorporates by reference into this section of his petition the statements set forth above in the Facts section as if set forth in this section.

57.     Defendant Microsoft, by and through its officers, agents, servants, employees or representatives, intentionally invaded Plaintiff's privacy by intruding on his solitude, seclusion, or private affairs. The invasion was highly offensive to Plaintiff and would be highly offensive to a reasonable person. Plaintiff was injured because of the conduct of Defendant. Plaintiff proximately suffered damages in an amount within the jurisdictional limits of this court for which Plaintiff herein sues.

58.     Defendant Microsoft, by and through its officers, agents, servants, employees or representatives, verbally publicized facts regarding Plaintiff's private life which were not of legitimate public concern. The publicity was highly offensive to Plaintiff and would be highly offensive to a reasonable person. Plaintiff was injured as a result of the conduct of Defendant. Plaintiff proximately suffered damages as a proximate cause and result of Defendants' actions in an amount within the jurisdictional limits of this court for which Plaintiff herein sues.

516

## XII.   DAMAGES

59.   Plaintiff sustained the following damages or elements of damage in an amount within the jurisdictional limits of this court for which he seeks compensation as a result of the actions and/or omissions of Defendants described above:

a.   Back pay from the date that Plaintiff was denied equal pay for equal work, and interest on the back pay, in an amount of compensation to Plaintiff as the Court deems equitable and just, and/or loss of earnings in the past;
AND, lost income resulting from Plaintiff's constructive discharge;

b.   Front pay in an amount the court deems equitable and just to make Plaintiff whole, and/or loss of earning capacity which will, in all reasonable probability, be incurred in the future;

c.   Loss of benefits, including bonuses, stock options, 401k matching contributions and any other pension plan contributions, and any profit-sharing plan contributions;

d.   Loss of enjoyment of life;

e.   Mental anguish in the past;

f.   Mental anguish which will, in all reasonable probability, be suffered in the future;

g.   Reasonable medical care and expenses in the past.  These expenses were incurred by Plaintiff and such charges are reasonable and were usual and customary charges for such services in Travis County, Texas;

h.   Reasonable medical care and expenses which Plaintiff will incur, in all reasonable medical probability, in the future;

i.   Deprivation of seclusion;

j.   Humiliation;

k.   Loss of time and Inconvenience;

l.   Physical discomforts; and,

m.   Injury to reputation.

## XIII.   EXEMPLARY DAMAGES

60.   Plaintiff would further show that the acts and/or omissions of Rummel and of Defendant Microsoft, by and through its officers, agents, servants, employees or representatives, including Manager Lori Aulds and co-worker Tracy Rummel, which are complained of herein were committed with malice or reckless indifference to the protected rights of the Plaintiff.  In order to punish Defendants, and to deter such actions and/or omissions in the future by Defendants or anyone else, Plaintiff also seeks a recovery of exemplary damages from

Defendants.

## XIV. ATTORNEY'S FEES

62.     Pursuant to Texas Labor Code Sec. 21.259, Plaintiff requests his attorney's fees and costs, and reasonable expert fees.

## XV. CONDITIONS PRECEDENT

63.     All conditions precedent to bringing this action have been performed or have occurred, or have been waived.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Michael Mercieca, respectfully prays that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for actual damages in an amount within the jurisdictional limits of the Court; exemplary damages; pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; attorney's fees; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

PAUL T. MORIN, P.C.
503 W. 14th Street
Austin, Texas 78701
(512) 499-8200; (512) 499-8203 fax

By: _____
Paul T. Morin
State Bar No. 14460550

Roy A. Pollack
Law Offices of Roy A. Pollack
Texas Bar No. 16092900
503 W. 14th Street
Austin, Texas 78701
Tel. (512) 472-6381; Fax (512) 499-8203
Attorneys for Plaintiff, Michael Mercieca

20

## CERTIFICATE OF SERVICE

I certify that on April 12, 2013 a true and correct copy of the foregoing was served upon the following as follows, and/or via the court's electronic notice system:

*Via Facsimile 512-708-1002*
Eric J.R. Nichols
Kate Skagerberg
Beck, Redden & Secrest LLP
515 Congress Ave. Suite 175 0
Austin, Texas 78701
Attorneys for Microsoft

*Via Facsimile 512-499-3660*
Robert M. O'Boyle, Mitchell Zoll and
 Derek Quick
Strasburger & Price, LLP
720 Brazos Street, Suite 700
Austin, Texas 78701
Attorneys for Tracy Rummel

Law Offices of Paul T. Morin, P.C.

By: _____
Paul T. Morin

21

# Tab I

**Letter announcing Mercieca's resignation, dated February 22, 2012, "effective April 2, 2012" (18RR:MSFT221)**

LAW OFFICE OF

# ROY A. POLLACK
603 WEST 14TH STREET
AUSTIN, TEXAS 78701

TEL (512) 472-6381
FAX (512) 499-8203

February 22, 2012

*Via fax: 512-708-1002*
Beck, Redden & Secrest, L.L.P.
Mr. Eric J. R. Nichols
515 Congress Avenue, Suite 1750
Austin, Texas 78701

> RE: Cause No. Mercieca v. Microsoft, Et. Al.
> Michael Mercieca —Constructive Termination

Dear Mr. Nichols:

As you know, Mr. Morin and I represent Michael Mercieca in a pending lawsuit against Microsoft.

Microsoft's inimical treatment of Mr. Mercieca, coupled with its inexplicable conduct pertaining to other employees who directly affect Mr. Mercieca, has endured for too long. As we approach nearly two (2) years of a consistently hostile environment, Mr. Mercieca has reached a point where he can no longer be subjected to such abusive conditions. Accordingly, consider Microsoft's hostile actions a constructive termination of Mr. Mercieca's employment. It follows that Michael Mercieca will not be returning to work, effective April 2, 2012.

Some highlights of Microsoft's enigmatic behavior include, but are not limited to, the following:

1) From the onset, Microsoft breached its policies by minimalizing and marginalizing Mr. Mercieca's initial complaint to Human Resources when Micky Shields claimed to have "conducted an *investigation*," but delayed any action and subsequently, summarily dismissed the complaint without ever interviewing the complainant, Michael Mercieca.

2) Next, Microsoft violated its own policies and duties to its employees by breaching confidentiality which is supposed to be implicit in internal investigations (and understandably so). Such breaches occurred internally and externally in Dan Shea's investigation and in Lori Aulds' relationship with Tracy Rummel.

Exhibit

MSFT 221

Δ π EXHIBIT 213

RP 48



3) Mr. Mercieca's supervisor and ex-lover and girlfriend, Lori Aulds, blatantly lied about her relationship with Michael in the internal investigation by the investigating attorney, Dan Shea. This is undisputed. The consequence? She was promoted. In addition, she has now been promoted again to the role of Sales Manager in the South Central Education team. It seems Microsoft is not too concerned about treating all employees equally - please reference Simon Negus lawsuit (Microsoft UK).

4) Among multiple unethical, unnecessary, and malicious acts, Lori Aulds with the full knowledge and support of David Tannenbaum, tried to coerce partners (clients), into complaining about Michael Mercieca to Human Resources, with no foundation - please reference Jason von Cordsen, Bass Computers.

5) Also Lori Aulds, Eddie O'Brien, and David Tannenbaum knowingly and maliciously suppressed a very positive e-mail about Mr. Mercieca from Bass Computers. Rather than taking pride in the performance of one of their top representatives, they elected to not pass on that feedback and instead created a baseless *"written caution"* towards Mr. Mercieca, while simultaneously placing the partner in a difficult and uncomfortable position.

6) Various other Microsoft employees that have misbehaved throughout this period of time remain comfortably in place. Such individuals include, but are not limited to, David Tannenbaum and Eddie O'Brien.

7) Eddie O'Brien, a Senior Vice President in the U.S. OEM team, publicly made egregious sexist, discriminatory, and racist comments, publicly and through e-mails, over a period of nearly two (2) years, including:

- *"I will get my friends in the IRA (Irish Republican Army), to blow up the French subsidiary"* – Team Offsite Presentation, December 8, 2009;
- *"Two Females Promoted to Director in U.S. OEM"* – Company announcement e-mail, May 3, 2010; and
- *"That said, when it comes to the U.S. Sub of the year, I would have zero pity for Japan and I will push 'em right under the bus and create another tsunami if I have to!"* – US OEM Team conference call, April 27, 2011.

This reprehensible behavior was reported by Mr. Mercieca multiple times to both Gwen Huston (GM of Diversity & Inclusion) and Lisa Brummel (Chief People Officer), to no avail.

In the latest complaint, Microsoft's investigation team chose to not investigate these incidents. There were no repercussions and, in fact, Eddie O'Brien received a strategic promotion to Vice President of U.S. Operator Channels. Mr. Mercieca received retaliation consistent with Microsoft's behavior in this matter.

8) Microsoft has circulated numerous derogatory and defamatory emails concerning Michael Mercieca for no sound reason. This again is in direct violation of its own policies and Standards of Business Conduct.

RP49

9) Despite piecing together 11 straight quarters, (33 months) of over-budget performance, Microsoft retaliated against Mr. Mercieca and in giving him the lowest review score possible—a five (5). Clearly, he deserved a ranking in the 1-2 range. As a result, he cannot transfer internally and is essentially, cemented in place. Such malicious conduct can only be viewed as retaliation and further pressure to force Mr. Mercieca to leave his employment at Microsoft.

10) The early rounds of discovery/document production of the lawsuit reveal various cover-ups within the Microsoft infrastructure. To say this is disappointing to a tenured, dedicated employee such as Mr. Mercieca would be a vast understatement.

It is unfortunate that Microsoft has chosen this course of action against one of the really good guys who has and continues to be a valuable asset and loyal employee for almost 18 years and who strives to uphold the very Standards of Business Conduct he is asked to support, despite the negative treatment to which he has been subjected. Based on the hostile environment created by Microsoft, the disparate treatment of Mr. Mercieca and Microsoft's retaliatory actions have caused a constructive termination of Michael Mercieca's employment.

In keeping with Mr. Mercieca's 18 years of positive performance, commitment, consistent professional approach, and work ethic, and in order to minimize disruption to Microsoft, his team, partners, and clients, he is prepared to work with his direct manager, Joe Sahagian, to provide a smooth transition in whatever way is mutually accommodating.

Please do not hesitate to contact the undersigned if you have any questions or comments.

Sincerely,

Roy A. Pollack

cc: Michael Mercieca

cc: Paul T. Morin, co-counsel

RP 50

# PAUL T. MORIN and ROY A. POLLACK

## ATTORNEYS AT LAW

503 West 14th street

Austin, Texas 78701

(512)-499-8200

FAX: (512) 499-8203

## FACSCIMILE COVER LETTER

To:         Mr. Eric J.R. Nichols

Facsimile:   512-708-1002

From:       Paul T. Morin

Date: 2/22/12                          Time: 4:00pm

RE:

Cause No. D-1-GN-11-001030; Michael Mercieca v. Microsoft et. al.

Number of pages (including cover sheet):_4_

Message/instructions:_____

_____

_____

_____

_____

### Confidentiality Notice

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE AND DOCUMENTS ACCOMPANYING THE SAME ARE LEGALLY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED HEREIN. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS TELECOPY IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR PLEASE IMMEDIATLEY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADRESS ABOVE VIA UNITED STATES POSTAL SERVICE. THANK YOU.

IF YOU DO NOT RECEIVE ALL PAGES AS INDICATED ABOVE PLEASE TELEPHONE US IMMEDIATLEY AT (512) 499-8200

RP 51

# Message Confirmation Report

Date/Time     : FEB-22-2012 04:53PM WED
Fax Number    : 5124998203
Fax Name      : POLLACKMORINKIESLING
Model Name    : 1815dn

| No. | Name/Number |  | StartTime | Time | Mode | Page | Result |
|-----|-------------|--|-----------|------|------|------|--------|
| 683 | 5127081002 |  | 02-22 04:51PM | 01'00 | ECM | 004/004 | O.K |

## PAUL T. MORIN and ROY A. POLLACK

ATTORNEYS AT LAW

FACSIMILE COVER LETTER

To:       Mr. Eric J.R. Nichols

Phone #:  512-708-1002

From:     Paul T. Morin

Date: 2/22/12              Time: 4:52pm

Re:

Cause No. D-1-GN-11-002000 Michael Morrison v. Kleverat, et al.

Number of pages (including cover sheet): 4

Message/Instructions: _____
_____
_____
_____
_____

Confidentiality Note

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL...

RP 52

# Tab J

**2011 Performance Review for Michael J.B. Mercieca, dated September 8, 2011 (18RR:MSFT216)**

## 2011 Performance Review for Michael J. B. Mercieca

| | | | |
|---|---|---|---|
| **Title:** | OEM ACCOUNT MANAGER | **Fiscal Year:** | 2011 |
| **Personnel Number:** | 99472 | **Manager:** | Joseph A. Sahagian |
| **Department Name:** | US - OEM SB Account Mgmt - West | | |

**Exhibit**

**MSFT 216**

www.jrsub.com

---

1    **Drive Partner Satisfaction: Drive Partner satisfaction to maximize customer and partner experience (CPE).**

**Execution Plan:**

- Drive managed account planning through CRM tool.
- Increase Executive engagements with key partners.
- Drive specific activities with managed OEM partners to address key drivers of satisfaction.
- Represent One Microsoft with approach to partners

Drive LINC attendance with applicable partners

**Accountabilities:**

- Achieve 50% OEM participation on poll
- Achieve OEM team NSAT goal of **151** for US Local OEM Division
- Written Conditions of Satisfaction (COS) meets or exceeds account planning criteria for all managed partners and posted in CRM by September 15, 2010.
- Update (quarterly) status of progress against COS quarterly and add new COS as necessary. Current quarter field must be updated before last day of fiscal quarter end.

Increase executive engagements via Redmond, LINC, PAC, WPC, and/or CES.

**Alignment** (optional): **No Alignment**

---

**Employee's Comment on Results Against this Commitment**

Poll participation was not 50%. On further investigation there were a number of contacts that were removed from CRM without input from myself. I escalated this to our CRM team and this continues to be investigated. That said, with Joe Sahagian's support, I re-entered data in CRM for the third time this past year. I have already stated that some of my partners elected not to respond because they felt they could not be truthful in the assessment of the relationship with Microsoft - some feel a sense of fear of receiving punitive responses for any perceived negative feedback to Microsoft. Nothing I can do about that except try to assure them the feedback is valued and we will change things if necessary. Not responding doesn't help anyone. I have plenty of examples of executive engagement however, what is troubling to me is that I have been cut-out of these executive engagements with Robert Youngjohns; Kevin Turner etc - this has been a source of frustration but I am confident this will change now I have a new manager in Joe Sahagian. This included the most recent event with the Microsoft Houston Store Opening - the EPG reps were invited and I was not and Lori Aulds drove the invitation to my Top Partner and CEO David Altounian from Motion Computing.

Since Joe came on board - I have received much more support and useful coaching and direction on key strategic issues. I have also received more inclusion with direct support from Joe and Peter Han our new GM. Joe and Peter have met all my partners collectively 3-4 times this year and based on the meetings I have coordinated, have created great relationships with the Texas partner ecosystem.

Unlike Lori Aulds who even in her new role has continued to marginalize and confuse my partners and many times internal Microsoft people with her actions - Joe and Peter have been very transparent and supportive in cementing my position with my partners as the lead.

My COS statements have been first rate with regular follow-up with my accounts and proactive CRM updates - I exceeded CRM updating beyond what was required by the subsidiary, including post scorecard timeline, with a view to ensuring continuity and preparedness for FY12.

My CRM quality was one of the highest on my direct team and Nationally with the following statistics:

- Exceeded US Team Average Score
- Exceeded Direct team Average Score - only Wayne Carey and myself achieved this with the rest being below team average
- Ranked 2nd on direct team on overall quality score
- Ranked 2nd on team for full completion of CRM

The level of Executive engagement is extremely high with one of if not the best attendance records at WWPC this year.

- 100% Partner organization participation at WWPC - this is at least the 4th year I have achieved this
- At time of writing this my partners contributed to:
    - 21%+ of the total OEM organizations represented
    - over 13% of the total people represented
    - Motion Computing received nomination for a WW Partner Award
    - Motion Computing received a US nomination and Award for US Mobility Partner of the Year - last year they were ranked as US OEM Partner of the Year

The overall team attendance numbers for WWPC overall were struggling and a change was made that Microsoft would subsidize the registration costs - my results were achieved prior to this decision and were based on a) my positioning of the value of WWPC and b) the long term personal and professional relationships I have developed over many years. having my complete set of partners represented is a consistent performance result in my territory over many consecutive years showing consistent and proven capability over a number of years.

The CPE comments I received from the responders I know were excellent - once again this is consistent and shows another element of my long term proven capabilities in this category.

**Optional Manager Comment on Employee Results against this Commitment**

Michael did not achieve this commitment, as he did not meet the accountability of 50% poll participation in FY11. His partner participation was at 36%, the lowest on the team, this demonstrates a lack of effort. The poll participation goal for FY12 is going to be significantly higher and he will need to put more time and effort into driving higher poll participation numbers. As a team we achieved our NSAT goal of 151 which is the highest it's been in many years. Michael's Condition of Satisfaction statements needed improvement in H1, but he showed noted improvements in H2 on his written conditions of satisfaction statements in CRM. As noted Michael drove strong WWPC attendance results getting all of his partners to attend WWPC where Michael's largest account (Motion Computing) was awarded the US Mobility Partner of the Year.

| 2 | **Win Customers: Increase Windows BOS Attach leveraging WGA in UPC reduction while complying with the terms of the Consent Decree** |

**Execution Plan:**

- Drive Windows 7 adoption and mix
- Drive Office conversions via PKC and FPP
- Renewed vigor for mis-licensing with deeper Industry sales team integration in support of AAA

Partnership with local Intel/AMD reps to mine for new partners and ensure right territory coverage and attach opportunities

**Accountabilities:**

- Achieve Windows Pro Mix of **80%**
- Achieve or exceed Embedded scorecard metrics
- Update Attach & Segmentation (PC shipments to include MNA) fields in CRM quarterly. Current quarter field must be updated before last day of fiscal quarter end (used to determine BOS attach rates). Ensure attach goals and actions are included in Business Plan.

- Achieve BOS attach metric for US Local OEM Division

Achieve IW Attach of **5%**

**Alignment** (optional): **No Alignment**

**Employee's Comment on Results Against this Commitment**

- Windows Pro Mix conservatively 90.86%
- Embedded Scorecard metrics:
  - 100% Achieved
  - Exceeded Design Wins by 50%
  - Exceeded On-Ramp of new OEM's by 50%
  - 2nd to Complete OED Scorecard on the whole National team - NB: Some reps still have not completed a l segments
  - By MYCD - No rep had completed all OED Tasks & Out of 10 reps 7/10 still had red tasks
  - My MYCD Embedded status was 5th out of 10 reps and 3rd on our own team out of 5
  - By Q3 only myself and Wayne Carey had completed ALL segments Including Q4 activities in advance
  - As stated above I was the one rep whom exceeded Design Wins and On-Ramp
  - The relationship I have with my OED colleague is first rate and has been for many years and continues in that vein
- CRM - All updates were made in or ahead of time
- IW Attach exceeded 5% - Total Market = 7.5% - COEM market (Only Partners who sell Office) = 29.46%
- Additional Information:
  - Leveraged UPC and my deep background in Microsoft licensing in the Clearcube TRADOC deal which resulted in over 3,000 seats of licensed Windows Client avoiding an unlicensed/mis-licensed customer/partner satisfaction AND legal issue
  - This deal was also highlighted within Marketing for the AAA program

**Optional Manager Comment on Employee Results against this Commitment**

Michael showed solid Windows pro mix of 90%+ exceeding his goal by more than 10 percentage points. He has also updated the A & S fields in CRM in the required time and fashion. Michael's met or exceeded all of the embedded scorecard metrics. Engagement with the Embedded territory PAM is very strong and partners have commented that they both work well together and represent the right "One Microsoft" approach. As a tenured level 63 I would like to see Michael take a more visible role on our Miss-licensing and AAA Framework.

**3** **Grow the Business: Grow the business and exceed our FY11 revenue and unit goals.**

**Execution Plan:**

- Work closely and collaboratively with MS Field to enable partner wins in local business
- Execute account growth planning across business groups: Client, IW, and Server.
- Explore growth opportunities across business groups with your managed partner.
- Where applicable: Successfully launch new Server products partners.
- Execute on MS Advantage and drive Office coverage and Office Conversions.
- *Leverage E&D team to drive FPP/PKC sales with strategic E&D partners.*

Development of new product designs.

**Accountabilities:**

- Achieve or exceed 100% attainment of final FY11 revenue based incentive quota.
- Meet or exceed quarterly account based Rev$ in FY11
  - $2,105,812 in Q1
  - $2,475,709 in Q2
  - $2,364,755 in Q3
  - $2,960,888 in Q4
- Meet or exceed Product Group Budgets
  - Client budget of **$7,757,000**
  - IW budget of **$1,584,164**
  - Server budget of **$566,000**
- Coordinate comprehensive Server launch plan encompassing technical, sales and marketing components. Checkpoints recorded monthly (CRM)

MS14287

Joint planning and v-team meetings with E&D team

**Alignment** (optional): **No Alignment**

### Employee's Comment on Results Against this Commitment

- Exceeded Final FY11 quota for the 2nd consecutive year
    - 2 reps did not make quota on the National team
    - 1 rep did not make quota for the 2nd consecutive year on the National team
    - At MYCD two reps were below quota
    - 1 at under 42% and 1 at under 71%
    - At MYCD my attainment was 109.07%
    - At MYCD I ranked 10th out of 16 reps
    - At MYCD 1 rep on my direct team ranked 16th out of 16 and had not made quota the previous Fiscal year.
    - At Full year my attainment closed at 112.83%
    - I ranked 10th out of 16
- Exceeded Quota for 8 consecutive quarters - only 1 of 6 reps nationally have achieved this.
- Client Budget was exceeded @ 120.72%
- IW and Server numbers were not made
- IW - I have highlighted this a number of times that my quota for IW was incorrectly set
    - National Team IW quota reduced 70%
    - Our direct team IW Quota reduced 79%
    - All reps on direct team took double digit reduction in IW quota
    - I took on 58% growth on over $1 million
    - One account (Bass) received 162% growth on IW quota YoY
    - If quota was set as I forecasted I would have exceeded IW quota by approximately 10%+
- Despite the incorrect quota setting , (I was not the only rep on the team with an IW mistake on quota - I understand Wayne Carey had the same/similar issue); I pursued the attainment with vigor
- Plans were put in place with my COEM partners - they are the only partners whom sell IW & Server
    - 2 out of 3 plans were met/exceeded which mitigated both IW gap and Server
    - I also drove a Client plan which was exceeded which more than compensated for any loss of IW revenue
- Server launch plans and training and readiness implemented and executed including the necessary CRM updates
- I took a strong role in the recent Intel Server Roadshow
- Product Group Data:
    - At MYCD I was one of 4 reps who had achieved 1/3 product groups
    - At MYCD one rep had not achieved ANY of their 3 product groups
    - At Full Year I was one of 3 reps whom had achieved 1/3 product groups - with the restatement of IW for my territory as previously explained I would have completed 2/3 product groups
- Embedded team relationship is excellent with a sincere and focused One Microsoft approach to meet partners and customers needs rather than inwardly focus on just the benefits for Microsoft.
- Active on v-teams including Embedded ; Education and Government and Healthcare

### Optional Manager Comment on Employee Results against this Commitment

Michael has met his overall Revenue commitment for the current fiscal year but has missed revenue targets on two of the three product groups. In doing so, Michael was one of only a few people who missed two product groups in FY11. Client revenue was at 120% of target, Office Revenue was at 72% of target and Server Revenue was at 76% of target. Each individual component of his Revenue commitment is as important as the overall attainment number. Michael has met or exceeded all four quarterly accountabilities in FY11 and as noted has done this for eight straight quarters. The expectation of the entire team is to hit their overall budget, meet all revenue targets with regards to product groups and to meet quarterly accountabilities. Meeting all three expectations is critical to successfully doing this role.

Finally, I would like to note that Michael's comments on this commitment include remarks about a

number of his co-workers. This type of narrative and speculation about other employees is inappropriate for his review, and I will not comment on that portion of his assessment. Microsoft takes the confidentiality of personnel information very seriously and asks its employees to do the same. In the future, I would encourage Michael to limit his comments to his own performance, and not that of others.

## 4    Compete

**Execution Plan:**

- Achieve CSI wins in market against Apple, VMware, Google, Linux and others
- Leverage Cloud and Virtualization opportunities

Utilize PTM, BG, and Product Group resources in compete situations.

**Alignment** (optional): **No Alignment**

**Accountabilities:**

- Submit a minimum of 1 substantial submission for either CSI or CPE MSNA award per half, focusing on UPC, VMware, and/or Linux.

Submit at least 1 new design win and 1 cloud win per half.

### Employee's Comment on Results Against this Commitment

Motion; Xplore & Clearcube achieved design wins - Motion had multiple - too numerous to mention in this review but a table of the wins & engagement globally are available. Xplore won a pilot versus iPad at AT&T & the Clearcube TRADOC deal won out against Linux and VMware and incorporates a virtualization solution

TRADOC was submitted for MSNA award

My whole year was driven mostly by compete in the tablet market and notable actions here are:

- Motion and Xplore compete engagement globally the best it has ever been
- Motion in particular considered the blue ribbon compete partner in Local Named and even against MNA
- Motion received Mobility Partner of the Year Award - 2nd year running they won a Partner Award
- Motion involved in many of the ACE compete account evaluations
- Motion also involved in 10's of compete activities across the globe with Fortune 500 accounts
- Motion tablets are being evaluated by 52 customers representing 30% of the total ACE accounts
- Motion covers 73 devices or 14.5% of the ACE pool
- Xplore with strong direction by Joe and Wayne Carey are now in contract with NCS to co brand their Tablets and breakthrough the highly lucrative Military market

Since Joe Sahagian has become my manager I am more motivated and inclined to nominate myself but more probably other individuals for awards and have done so this semester as he is simply supportive of the activities I undertake

I am also diligent in leveraging the new KUDOS tool and have been told that I am the only person known by my manager who actually uses that tool to provide feedback on my peers and other groups in the company.

### Optional Manager Comment on Employee Results against this Commitment

Michael did not fully achieve this commitment and he did not submit a substantial submission in H1 for either a CSI or CPE MSNA award. This did not meet the expectations of the commitment. In H2 Michael did submit several award nominations and as noted is quick to nominate others for their work either through formal local awards, the kudos tool or an email highlighting what has been done. I am encouraged by the amount of activity in H2 and the nominations he made. It will be important to keep that same level of intensity throughout the year and as we look to the future.

## 5    Sales Excellence Integral to the achievement of commitments is the method in how they were achieved and the approach we take to our job with regards delivering and living up to those commitments

**Execution Plan:**

- Utilization of Account plans and CRM tool to

**Accountabilities:**

- Account plans (GOSART) populated in CRM

MS14289

- drive business relationship and growth with a strategic 3 year vision.
- Utilization of forecasting process and tools to deliver timely and quality forecast
- Leverage of technical & marketing resources to provide comprehensive growth strategies into account planning and engagement
- Drive all up team strategy for designated product group or vertical.

Deep knowledge of business drivers/insights for each and every account and communicate them thru quality MBRs.

for 100% of accounts by 8/31. Achieve an average account plan rating of 20 for FY'11.
- Forecast accuracy +/-5% quarterly (set at day 1 of new quarter from dashboard)
- Conduct at minimum quarterly business review with all accounts; marketing and technical team participation in QBR process with designated marketing and technically engaged accounts as evidenced by shared/posted QBR documents
- Demonstrate effective fund utilization targeted at driving new customers and maximizing revenue
- opportunity and deliver targeted ROI
- Review remaining content in CRM 1x per half to ensure content is populated & current. Check points on 11/1 & 4/1. CPE Contacts are top priority
- Achieve 100% of all Named contract and MDA deadlines are met within stated timelines.

Deliver quality MBRs by designated deadlines.

**Alignment** (optional): **No Alignment**

**Employee's Comment on Results Against this Commitment**

- Account Plans were completed before required deadline and my initial average account plan score exceeded commitment goal – this improved as the year went on and that was a goal I had set myself
- Forecast Accuracy is solid – my rhythm of updating forecasts is timely and proactive using multiple mediums to update business changes to my manager to ensure accurate up-line reporting
- I do not have the final forecasting accuracy numbers but am confident that I am in line with expectations or pretty close to it.
- Regular account meetings and business reviews executed which is emphasized by a) my knowledge of the business and accounts b) by the relationships I have with my accounts
- CRM statistics:
  - Exceeded US national Team Average Account Plan quality score
  - Exceeded direct team Average Account Plan quality Score – only myself and Wayne Carey achieved this
  - Ranked 2nd on direct team for Quality Score
  - 2nd to complete Full CRM updates in total this semester and through fiscal year
  - Exceeded updates cycles set by Robert Bostwick and management scorecard
  - Exceeded checkpoint updates and worked with CRM team to fix ALL contacts and not just CPE Contacts to strengthen the integrity of the CRM tool
- Excellent utilization of discretionary and Opportunity funding meeting and exceeding required ROI
- All MDA deadlines achieved
- Cross collaboration with Vertical teams & other Microsoft teams has been excellent – examples of this are:
  - SLG
  - Education
  - Healthcare
  - Worldwide Partner and EPG teams
  - GSOC Security teams
  - Federal Homeland Security teams
- Self funded support of District partner Events to 12 Fortune 500 customers – Min Max Technologies Dallas – Not expensed and paid with my own vacation and funds to support a Microsoft unmanaged partner whom could not receive District Support (In short I paid to support an unsupported Microsoft partner out of my own time and monies).
- Cross Collaboration with my own team mates and support teams

**Optional Manager Comment on Employee Results against this Commitment**

MS14290

Michael has shown that he is effectively communicating forecasting risks and opportunities weekly through the 2 up and 2 down process. All of Michael's agreements were met within the stated timelines. As noted in commitment 1, Michael showed a strong commitment to using our CRM tool. While H1 was not at the standards I have set for CRM tool use, there were measurable improvements in H2 across all areas of CRM account planning including but not limited to account plan scoring, conditions of satisfaction, and attach and segmentation. Michaels forecasting accuracy did not meet +/- 5% quarterly in any of the 4 quarters, but this was something that was not achieved by anyone on the team.

## 6 People: Readiness, Development and Opex Increase sales readiness and competency with focus on personal development plan and training completion plan

### Execution Plan:

- Complete prescribed training and certifications for Field Readiness Index (FRI).
- Utilize Career Compass, Role Guide and other resources to achieve personal and professional development.
- Utilize OPEX to maximize opportunities while maintaining budgeted amounts.

### Accountabilities:

- Readiness Plan completed, including FastStart Readiness activities completed by deadline, required training by due dates, Red Carpet Handoff process where applicable and recommended training as agreed to with manager.
- Successfully complete all required courses and 100% completion against FRI targets on time
- Career development plan in place, proactively drive quarterly career discussion with Mgr, completeness of Mid-Year Career Discussion (MYCD) on time.
- Complete 2 optional online Role Guide courses during FY11; 1 in each half

Spend in line with allocated travel and expenses (T&E) budget at no greater than 100%

**Alignment** (optional): **No Alignment**

### Employee's Comment on Results Against this Commitment

- Readiness Plan Completed - consistently first to meet FRI deadlines
- Completed ALL required Courses
- Exceeded Optional On-Line course requirement - see below
- Actively involved in FRI Alpha Course testing
- Selected for Best Practice Case Study and use of FRI for Cloud Computing positioning - Case Study written up
- Actively involved in shaping/designing content for Mandel Storytelling Courses
- OPEX management is first rate with spending below Expense budget
- Was asked to tighten spending to mitigate over budget spending of others on the team and managed my business accordingly to help in this regard - simply my budget management skills helped mitigate overspending by others on the team
- Received excellent feedback on my MBR's and also my weekly up/downs in terms of right balance of quantity, quality and business insight
- Gave my new manager my semester review - this is unrequested by him and is something I do in the normal course of business.

### Courses Completed

MS14291

| Course Title | |
|---|---|
| ┤22645/Cloud Services Readiness Day (Las Colinas, TX) | |
| ┤50448/Mandel: Communicating Microsoft Value Through Storytelling - for OEM | |
| ┤Cloud Services Readiness (Pre-Read) | |
| ┤Cloud Services Readiness (Regionally Facilitated) | |
| ┤Cloud Services Readiness Test | |
| ┤Communicating Microsoft Value Through Storytelling - for OEM | |
| ┤FY11 Incentive Compensation (RBI) | |
| ┤FY11 Priorities and Compete Strategy | |
| ┤Global Diversity and Inclusion at Microsoft 2.0 | |
| ┤Leading With Our Future: Cloud Computing Update | |
| ┤Leading With Our Future: Cloud IT as a Service (Data Center) | |
| ┤Leading With Our Future: Cloud Productivity | |
| ┤OEM Business Policy Compliance | |
| ┤Standards of Business Conduct 2010 - SMSG | |
| | |
| ┤Windows Phone 7 Fundamentals | |
| ┤Windows 7 Opportunity (Accelerate) | |
| ┤Windows 7 Professional Value and Licensing for OEMs | |
| | |
| ┤Compete to Win: Virtualization and Private Cloud | |
| ┤OEM & End-user Windows Downgrade Rights | |
| ┤OEM Licensing and Business Fundamentals 101 | |

**Optional Manager Comment on Employee Results against this Commitment**

Michael has met his accountabilities for this commitment and as he noted, is involved in alpha testing of FRI courses prior to release to the rest of Microsoft. He has also been involved with helping to shape the Storytelling course from Mandel Communication. Michael kept his T&E Expenses in line with budget. Michael successfully met all the accountabilities of this commitment.

**Overall Performance**

**Employee Overall Performance Summary: Summarize your results against commitments and how you demonstrated your ability to collaborate across boundaries, impact and influence others, and exhibit interpersonal awareness and confidence. In addition to these core competencies, include how you demonstrated any other profession-related competencies that were key to your deliverables.**

**MID YEAR SUMMARY:**
The past semester has been good from a revenue perspective - consistent over budget performance - 6 consecutive quarters with a goal for 7 and 8 this fiscal year. My relationships across my partners is excellent - with mutual respect and appreciation on a very deep level. This performance has been achieved despite the negativity and marginalization by my management team - Joe Sahagian is an exception to this. I have had a 12-15 month issue with my organization that has included an internal investigation and now an external escalation and formal complaint to the Texas Commission for Human Rights and the EEOC - Microsoft has been made aware of this at the highest levels. This has been a source of great pressure and distraction for me yet I continue to perform and bring in my revenues; nurture strong relationships and put my partners; customers; and Microsoft overall first.

I want to confirm that my current manager, Joe Sahagian, is not a part of this negativity and given the circumstances I believe he has been a breath of fresh air and integrity in this leadership team which has shown itself to lack core values espoused by Microsoft in our Standards of Business Conduct. Even in his short tenure he has shown me tremendous support in my account activities and he reminds me of the time when Microsoft encouraged us to think big and believe in our core values and operate as a true trusting team.

Microsoft would do well to increase Joe's responsibilities and span of control and sphere of influence. He has a great gift of strong Emotional and Intelligence Quotients. He reminds me of Barry Ridgway and Phil Sorgen in terms of his management style and understands the business.

MS14292

He epitomizes walking the walk and not just using rhetoric as a punch-line but as a standard and code to execute.

This is my MYCD but these are important factors that I feel passionately about and have a direct impact on both mine and the teams OHI and ability to execute on our overall commitments. I still believe that Microsoft, the company, stands for something great. What I am uncomfortable with is the gulf between our code and values and execution of them.

## FULL YEAR SUMMARY

Another successful year with the following accomplishments:

- Excellent performance across the year for all my commitments - always room for improvement as I strive and aspire to perfection in all aspects of what I do
- My approach has been positive and driven and despite the lack of support and roadblocks from Microsoft management,(excluding Joe Sahagian),and the constant undermining and marginalization of my partner relationships, my territory operates extremely effectively and the partner relationships and CPE are superb although even my partners sense things are not right.
- I hold myself to the highest standards and whilst I am the first to say I can always improve as that is in my nature, I also know that I have performed consistently and highly with integrity and passion and fully supporting Microsoft's initiatives and being supportive of my management team in Joe.
- I operate as a positive team player making myself available to anyone in any team in any division in any country   I have a plethora of examples of this in my career and in the past year including self funding a trip to support a Microsoft partner in need.

After Mid year I was placed on a weekly performance review with my manager, which is an indication that I am being given unwarranted extra scrutiny which I see as continued harassment and unwarranted focus based on my past and current formal complaints and following legal actions. In short this retaliatory by Microsoft and not only contrary to internal policy but is illegal.

This request for additional reviews was based on my first semester performance as it was MYCD so I am confident that Joe Sahagian was not part of this process and that it was mandated by management and/or HR. The request was based on 3 elements which I had already raised as areas of focus proactively to improve upon, (that does not mean they were bad or bad relative to the team), they were just areas to increase performance as one can always look to improve ones performance.

These were then used against me which I find perplexing and deeply upsetting- these areas were Product Group performance; Embedded Scorecard and CRM.

At Mid-year I have found on further scrutiny that more than one person did not meet criteria in these areas as well as myself. One individuals performance included:

- Having lower Embedded Scorecard performance than myself
- My CRM score exceeded team commitment level - this individuals was no better at that point
- This person had only made 1/3 Product groups like myself   the one he made was not client (the biggest number and mine was); also my IW number was incorrect -see above
- The individual posted the LOWEST revenue number by MYCD and was below 71% of budget
- This was a continuation of poor revenue performance as he did not make budget (1 of only 2 reps) in a launch year fiscal FY 10 when everyone else made and exceeded quota.

I have to then hypothesize that a) this individual was receiving special concessions and/or b) I was receiving unnecessary and unwarranted negative focus as a retaliatory measure to "build" a case against me. In short, why was I placed on weekly performance reviews and this individual was not despite his poorer performance record and trending and over budget expense spending?

Despite the negativity; harassment;  the uncomfortable and untenable environment that forced me to elect to work from home and the ever increasing negative pressure and additional workload review

MS14293

requirements placed on myself, I have still chosen to rise above this and put Microsoft; Partners; Customers and my colleagues first and continue to drive attainment in line and often in excess of commitment levels.

Whilst not perfect, ( I will and always will continue to strive for that level), I will not allow the detractors to sway my performance to a negative route - I am paid by Microsoft to manage a business and all the previously mentioned teams and individuals rely on that performance.

Despite unilaterally not being given any leadership projects this year by the management team, I continue to operate as a leader and in line with our Standards of Business Conduct highlighting to my manager and GM when others (Directors' and above) have not. I take my role extremely seriously and see myself as an ambassador of Microsoft in everything I do 24/7.

I have almost completed 18 years at Microsoft and I continue to execute my responsibilities diligently; consistently and with compassion and integrity and with a high degree of business acumen. My consistency and proven capabilities over each role in almost two decades and in this role, despite the toxic environment that I find myself in, - have been nothing short of assiduous and I am confident that should Microsoft in this review and beyond find otherwise, that the investigations and information that will continue to ring information to light come to light will fully support my excellent record of proven performance and capabilities.

To my manager Joe Sahagian I will formally go on record in thanking him for managing this delicate situation with integrity and poise and a high degree of professionalism which from my experience of him over the years is of no surprise.

---

**Manager's Overall Performance Assessment: Summarize both the employee's results against commitments, and how well this employee demonstrated an ability to collaborate across boundaries, impact and influence others, and exhibit interpersonal awareness and confidence. In addition to these core competencies, include any other profession-related competencies that were key to his or her deliverables. When assessing overall performance consider the environment in which results were achieved and the impact of performance relative to peers. \*Summarize the employee's proven capability based on a longer-term demonstrated history of taking on more challenging work while continuing to deliver results (\*proven capability is not applicable for an employee's first review at MS).**

Michael, you did a good job meeting each of your all up revenue quarterly accountabilities, as an account manager, this is very important. Another area that you showed solid performance was around driving WWPC attendance and across being an alpha tester on our FRI courses. Some commitment areas where you need to stay focused on in FY12 are meeting all of your Product Groups, driving better poll participation and keeping your plans in CRM up to date with quality short and long term goals and objectives. You also have done a good job of staying in front of the trends within your business especially as it relates to Motion Computing and Xplore Technologies tablet opportunities and challenges.
Despite some of the above areas of success, there are number of areas where you did not achieve your commitments and I expect to see consistent and sustained improvement. An area for development and opportunity around Microsoft competencies is product and technology expertise. Managing our largest tablet partner provides the opportunity for you to bring real time intelligence back to the broader team around compete and competitive trends within the market place. Another area of development is cross group collaboration. Over the past year you have not been able to generate support from others. Feedback - both verbal and from the feedback tool -- indicates that others are having trouble partnering with you. You have engaged with others in a way that makes then not want to partner with you. How you perform your job is just as critical as your end results. Your inability to partner with your team is not good for our internal team dynamics, external team dynamics and customers.
Finally, I note that your overall self-assessment contains speculation and hypothesis about other employees. Again, this is not appropriate content for your annual review. You also suggest that the

performance coaching we have worked on over the last year is retaliatory in some way. I can assure you that I take the development of employees very seriously, and that I initiated this action as a way to help you improve both the "what" and "how" of your performance. Any coaching and management I have provided you was a result of legitimate business and performance concerns.

I am giving Michael a score of 5 for his work in FY11. This rating is indicative of him not meeting expectations in terms of his results against some of his commitments and "how" the work was accomplished. Michael will need to demonstrate a greater ability to perform his current role at an acceptable level in FY12

**Performance Rating:** 5

**Supporting Documents** (optional)

**Note** The attached document(s) may relate to one or all of the above commitments.

By typing my name and employee identification number below, I confirm that I have received this assessment and discussed it with my reviewer. The typing of my name and identification number does not necessarily mean that I agree with my reviewer's comments. Please type your name and ID exactly as they appear.

**I AUTHORIZE MICROSOFT TO STORE MY ASSESSMENT FORM ON A SERVER LOCATED IN WASHINGTON, USA.**

| Employee Signature: | Employee ID: |
|---|---|
| Michael J. B. Mercieca | 99472 |

MS14295

# Tab M

**ER Investigations Summary Memo, dated October 4, 2010**
**(18RR:MSFT180)**



EXHIBIT 129
WIT: Shea
DATE: 3/7/13
JUDY BONICELLI, CCR 2322

# ER Investigations Summary Memo

To: Micky Shields, HRBP

From: Dan Shea, ERIT

Date: October 4, 2010, 2010

Re: Investigation of Complaint of Michael Mercieca

## Investigation Parties

Complainant: **Michael Mercieca, L63, Partner Account Manager, US-OEM, MSNA**

Subject: **Lori Aulds, L65, Director Named and Vertical, US-OEM, MSNA**

**David Tannenbaum, L65, Director OEM Field Sales, US-OEM, MSNA**

**Eddie O'Brien, L69, Vice President, US-OEM, MSNA**

## Background

In January 2010, HR and ERIT consulted regarding some concerns raised by a contingent staff (CS) employee, Tracy Rummel, in November 2009 through a Microsoft manager, Lori Aulds, against the Complainant, Michael Mercieca. HR instructed Tracy to raise her concerns with her employer. HR followed up with the CS employer and the CS employer informed HR that Tracy did not wish to raise concerns or proceed with an investigation.[1]

On February 23, 2010, Michael contacted his HRBP, Micky Shields, and stated that he wished to raise a "formal complaint" regarding actions in November 2009 related to Tracy Rummel. His contact with Micky followed a 1:1 with the subject, Lori Aulds, in which Lori revealed to Michael that Tracy had raised concerns about him in November 2009. A number of calls/emails between Micky and Michael followed that initial contact.

On March 26, 2010, Michael was interviewed by ERIT at Micky's request in order to better understand his concerns. Michael's concerns in that interview focused on the fact that allegations were raised against him by Tracy to his manager's attention and that his management chain was aware of the allegation. Michael did not raise any concerns regarding discrimination because of gender and/or national origin and Michael did not raise any concerns regarding sexual

---

[1] The CS employee, Tracy Rummel, was hired as a Microsoft FTE on February 15, 2010. She raised concerns to HR in May 2010 that Michael made unwelcome sexual advances towards her while she was working as a vendor for Extreme Consulting[1]. She also alleged retaliation by Michael. That matter was investigated by ERIT separately and the allegations were not supported by the evidence.

**Exhibit**

**MSFT 180**

Upon learning of Michael's concerns, Microsoft initiated an investigation to determine whether the subjects' conduct Michael violated Microsoft's Anti-Harassment/Anti-Discrimination Policy and Non-Retaliation Policy. The evidence does not support the finding of a policy violation.

**Investigation Process**

**Date Investigation Initiated:** August 11, 2010[3]

**Persons Interviewed:**

| Name | Title/Organization | Date(s) Interviewed |
|---|---|---|
| Michael Mercieca | Partner Account Manager | March 28, 2010; August 11, 20 & 30, 2010 |
| Lori Aulds | Director | August 18 & 24, 2010; September 13 & 22, 2010 |
| David Tannenbaum | Director | August 24, 2010; September 10, 2010 |
| Micky Shields | HRBP | August 31, 2010 |
| Eddie O'Brien | Vice President | September 2, 2010 |
| Doug Thompson | Partner Technology Manager | September 10, 2010 |
| Charlene Bowman | Group Marketing Manager | September 13, 2010 |
| Megan Both | MSNA Chief of Staff | September 13, 2010 |

attorney provided any evidence supporting that allegation other than their dissatisfaction with Micky's work performance. The investigation showed that Micky did reach out to Michael via phone and that Michael was non-responsive to probing questions. Therefore, the evidence does not support the allegation by Michael and/or his attorney that his gender or national origin was/is a factor in Micky's treatment of him. Accordingly, I did not find that Micky's treatment of Michael violated Microsoft's Anti-Harassment and Anti-Discrimination Policy.

[3] This investigation also incorporated interview notes from ERIT's initial triage of Michael's concerns on March 26, 2010 and the separate ERIT investigation into Tracy Rummel's allegations *against* Michael that began on May 17, 2010.

MS37856

| Marc Pisan | Group Marketing Manager | September 23, 2010 |
| Deanna Sweeney-Grammo | Regional Sales Manager | September 23, 2010 |

## Documents Reviewed

I reviewed documents provided by Michael, Lori, David, Eddie and HR, including, but not limited to relevant emails, documents, photos and performance history.

## Summary of Investigation

### Allegation: Sexual Harassment under Microsoft's Anti-Harassment & Anti-Discrimination Policy-Unsupported

Alleged Past Romantic Relationship between Lori and Michael

For the first time, on August 11, 2010, Michael alleged that he and Lori had been romantically involved as peers at Microsoft from October 2001 through January 2002 and that the two of them had "went out a handful of times" on romantic dates through 2004 or 2005. Michael also alleged that when Lori applied for the open manager position on his team in 2007 she requested he not mention their past relationship to the hiring manager, Megan Both. He stated that there was "no upside for me in mentioning it [past relationship]" to Megan so "I kept my mouth shut and did my job." He stated that "Megan called me and I said she was a good hire." In support of the past romantic relationship, Michael provided voicemails, photographs and additional evidence from 2002.

Lori initially denied that she and Michael had ever been romantically involved in the past. She stated that they were friends and would go out together and travel together but that there was no sexual relationship. During a subsequent interview in Austin, Texas I showed the evidence provided by Michael and Lori then admitted to the past romantic relationship. She stated that she spoke to Michael when applying for the job in 2007 and that he was supportive and had no concerns. She said that Michael told her not to reveal the past romantic relationship to Megan and that, since becoming his manager, "I have been very careful to maintain a professional distance so there would be no misunderstanding."

Witness/Both and documentary evidence corroborated that Michael was supportive of Tracy's hiring as his manager in 2007. Witness/Both stated that Michael called her and said that Lori was a "great person and a great hire." Following his call with Witness/Both, Michael sent an email to Lori on July 2, 2007 detailing the call and including statements by him: "I WOULD HIRE YOU" and "I would be happy to work for you."

The investigation revealed documentary evidence that corroborated Michael's allegation of a past romantic relationship between him and Lori prior to her becoming his manager in 2007. When confronted with documentary evidence, Lori admitted the past romantic relationship. The

MS37857

investigation also revealed documentary evidence and witness evidence that Michael was supportive of Lori's hiring and that neither Lori nor Michael revealed the past romantic relationship to the hiring manager in 2007.

Alleged Unwelcome Conduct

On August 11, 2010, Michael alleged that he had been sexually harassed by Lori since she became his manager in 2007. Michael specifically denied any sexual advances by Lori or any pressure by Lori to return to their past romantic relationship while she has been his manager. He identified her harassment as unwelcome verbal conduct, including: Lori alluding to their past romantic relationship in 1:1s; Lori making a statement regarding their past sexual relationship to Michael at his cubicle; Lori asking Michael to "mediate" her relationship with another man; Lori asking Michael to go out dancing; and Lori threatening his job if he revealed their past romantic relationship. When questioned, Michael did confirm that he never raised any of these concerns to HR until speaking with ERIT on August 11, 2010 and that he had provided positive feedback regarding her management of him and the team.

Lori responded to the allegation of sexual harassment by denying that she acted inappropriately towards Michael. She specifically denied alluding to their past romantic relationships in 1:1s, making a statement regarding their past sexual relationship, or threatening Michael's job if he revealed their past relationship. She denied asking Michael to go out dancing after she became his manager as she wished to keep their relationship strictly professional. Lori confirmed that Michael did intervene in a 2008 domestic issue between her and her ex-boyfriend, Chris Kelly. She stated that she did not want that to happen but that she shared information with Michael regarding problems in her relationship and that Michael "wanted to be protector" and voluntarily contacted Chris and met with him at her home. Lori stated that "I never shared anything with Michael" after that occurrence. Lori provided documentary evidence, including emails and his WHI scores for her in FY09 (sent directly to her by Michael), where Michael praised her work as his manager.

Witness/Thompson has worked closely with Lori and Michael in the Austin office since Lori became Michael's manager. He noted a professional and congenial working relationship between Michael and Lori through beginning of FY10 that included the three of them often going to lunch together. He observed no discomfort by either Lori or Michael and noted "they have known each other for a long time."

Witnesses and documentary evidence did not corroborate Michael's assertion that Lori alluded to their past romantic relationship in 1:1s, made a statement regarding their past sexual relationship at his cubicle, asked him to go out dancing (as his manager), or threatened his job if he revealed their past romantic relationship. Documentary evidence did corroborate that Michael voluntarily involved himself in Lori's domestic issues with her ex-boyfriend and that Lori permitted that to occur.

The investigation revealed there was a close personal (non-romantic) friendship between Lori and Michael after she became his manager in 2007.[4] The investigation did not find evidence

---

[4] For example, in an email dated October 2, 2008, Michael stated to Lori: "I have dropped everything when you had your problems with Chris whatever times of the day or night and come over and called you to check on you – when

supporting the unwelcome verbal conduct by Lori cited by Michael in support of his allegation of sexual harassment. The comments related to the past romantic/sexual relationship were denied by Lori and there were no witnesses/documentary evidence corroborating them. Also, Michael's involvement in Lori's domestic issue appeared voluntary on his part.

<u>Analysis and Conclusion</u>

Although Lori and Michael did have a past romantic relationship in 2002 and a close personal (non-romantic) friendship that deteriorated in FY10, I did not find support for Michael's allegation that he was sexually harassed by Lori. There are a number of factors that led to this conclusion: Michael supported Lori's hiring as his manager in 2007 and communicated that support to the hiring manager; Michael praised Lori's management in emails and in the FY09 WHI poll in contradiction of his subsequent allegation; Witness/Thompson observed a professional and congenial working relationship between Lori and Michael since Lori became Michael's manager and no discomfort on the part of Michael; and Michael did not raise this allegation or inform HR of the past romantic relationship until after he was identified as a subject in an ERIT investigation alleging sexual harassment and after issues were raised by Lori about his performance thereby raising significant question regarding his motive. Therefore, based on the totality of the evidence, I do not find that Lori's treatment of Michael violated Microsoft's Anti-Harassment and Anti-Discrimination Policy.

I do find that Lori exercised extremely poor judgment as a manager. She should have disclosed the past romantic relationship and the close personal (non-romantic) relationship to Human Resources or management at Microsoft at the time she was hired as Michael's manager, shortly thereafter, or when Micky was looking into Michael's concerns in March 2010. She also should have answered truthfully when I first asked her in this ERIT investigation whether she had been romantically involved with Michael in the past.

**<u>Allegation</u>: Gender and National Origin Discrimination Under Microsoft's Anti-Harassment & Anti-Discrimination Policy-Unsupported**

On August 11, 2010, Michael also alleged that Lori, David Tannenbaum, and Eddie O'Brien had discriminated against him because of his gender and his national origin.[5] In support of this allegation, Michael raised some of the following issues:

- Subjects pressured him to leave his job
- Subjects increased their focus on his performance
- Subjects provided no positive affirmations or promotions
- Subjects marginalized him
- Subjects made derogatory comments

---

was the last time you called to actually just check on me and not return one of my calls or call me for a non work related issue? I have always been there for you. I have even covered for you in the office when you were tired or upset to come in -- no judgment -- no expectations -- just putting friendship first knowing you will take care of business as I will and have always done."

[5] Michael and his attorney had previously stated treatment from his management was related to Tracy Rummel's allegations against him in November 2009.

harassment by Lori. The matter was referred back to Micky for further handling by HR and a number of additional calls/emails between Micky and Michael occurred.

On April 19, 2010, Michael emailed to Micky and ERIT a document titled, "Formal Complaint from Michael Mercieca." The document again raised Michael's concerns about the fact that allegations were raised against him by Tracy Rummel and that his management chain was aware of the allegations: "I have become a victim of a malicious baseless rumor which has assassinated my character and marginalized my role on the US Local OEM Team"; "A baseless rumor has escalated, unknown to myself, throughout the management structure and HR, which I believe is the catalyst for the treatment I have been subjected to." In the document, Michael did not raise any concerns regarding discrimination because of gender and/or national origin and Michael did not raise any concerns regarding sexual harassment by Lori. The matter was referred back to Micky for further handling and follow-up by HR.

On May 25, 2010, Michael was notified by ERIT that he was the subject of an ERIT investigation related to Tracy's allegations. In response to that notice, Michael stated: "I am beginning to think that given Ms. Rummel is receiving increased focus and I am now being discriminated against as well as harassed. I will obtain advice from counsel on this point."

On June 9, 2010, Michael's attorney forwarded correspondence to Microsoft stating: "Please consider this correspondence a supplementation to Mr. Mercieca's original *Formal Complaint* (lodged on April 19, 2010)." That correspondence included broad alleged violations of Microsoft's Anti-Harassment/Anti-Discrimination policy and Non-Retaliation policy, including:

- "...Microsoft's harassing, discriminatory, and retaliatory conduct based on his gender and national origin, which has surfaced since approximately November 2009."
- "...sexual harassment in the workplace."
- "...Microsoft's steady course of retaliation pertaining to various aspects of his employment with Microsoft."
- "...the hostile work environment that has surrounded him since undisclosed allegations pertaining to him started to covertly spread throughout the infra-structure of Microsoft."

## Summary of Allegations

Michael alleged that he had been sexually harassed by Lori. Michael highlighted in support of this allegation the fact that he and Lori had been romantically involved (October 2001 through January 2002) prior to Lori becoming his manager.

Michael also alleged that Lori, David Tannenbaum, and Eddie O'Brien had discriminated against him because of his gender and his national origin.[2] Michael also alleged that the subjects had retaliated against him.

---

[2] In addition to the primary subjects listed, Michael, via his attorney's statement, also raised an allegation that the HRBP, Micky Shields, failed to involve Michael when looking into his April 19, 2010 "formal complaint" and before concluding that there was no support for the concerns raised within it regarding Michael's work relationships, and that this failure/omission was because of Michael's gender and national origin. That allegation was investigated by ERIT and the concerns regarding work performance were escalated to HR management. Neither Michael nor his

MS37860

## Pressure to Leave His Job

Michael stated that the subjects pressured him to leave his job at Microsoft and/or within US OEM. Some of the examples he provided included: Eddie expressing concern to Lori that Michael was still in role at end of FY09; Lori sending Michael emails in October 2009 and February 2010 suggesting he research an OEM Country Manager/Director position and apply for jobs overseas; Lori suggesting to Michael in December 2009 that he work for a non-profit agency; and Lori telling Michael in April 2010 that he need to find another job.

The subjects denied pressuring Michael to leave his job at Microsoft and/or within US OEM. Regarding the specific examples above that Michael identified, subjects, witnesses and documentary evidence indicated the following:

Eddie confirmed that he raised a concern to Lori at end of FY09 that Michael was still in role at L63. Eddie stated, and documentation corroborated, that Michael had been a L63 for 4+ years, that he had observed Michael's performance on partner visits in FY09, and that he saw no evidence of an opportunity for advancement for Michael beyond L63 within US OEM based on his observations. Eddie stated, and documentation and witnesses confirmed, that he provided Michael with a FY10 stretch opportunity (UPC project) in order for him to show that he could demonstrate the skills and abilities to perform at the next level.

Lori denied telling Michael to find another job or work for a non-profit agency. She confirmed that she sent emails to Michael regarding open positions at Microsoft. She stated, and documentation and witnesses corroborated, that she and Michael have had career discussions, that the open positions might provide Michael the advancement to level not available within US OEM, and that the same positions have been suggested to other members of her team. Witness/Sahagian confirmed that he was notified regarding one of the positions by David and had gone for an informal interview.

## Increased Focus on Performance

Michael stated that subjects increased their focus on his performance. Some examples he provided included the following: David criticized Michael for missing deadline on UPC project in February 2010; David and Lori twisted positive feedback from partner into negative feedback in April 2010; Lori accused him of lying about partner visit in April 2010; Lori reprimanded Michael for an outburst outside her office on August 3, 2010; and Lori questioned the amount of his vacation in Q4.

The subjects denied any increased focus on Michael's performance. Regarding the specific examples above that Michael identified, subjects, witnesses and documentary evidence indicated the following:

David confirmed, and witnesses and documentation corroborated, that Michael was appointed the lead of the UPC project by Eddie in November 2009 and that he missed an assigned January 2010 deadline for outlining a plan and strategy on the UPC project. David stated, and documentation corroborated, that he subsequently followed up with Michael in February 2010 after the deadline had passed requesting the plan/strategy.

Lori stated, and documentation corroborated, that she and David were concerned in early April 2010 about how Michael was positioning T & E budget constraints with his partners based upon Michael's statements to them. She stated, and documentation corroborated, that this concern was reinforced when she and David received an email from a partner that praised Michael's work but also identified their T & E budget as the reason the partner had limited visits from Michael that affected their numbers with Microsoft. Based upon the statements from Michael and the email from the partner, Lori provided constructive feedback to Michael around discussing T & E budget issues with partners. She stated, and documentation confirmed, that Michael pushed back on her and was non-receptive to the feedback.

Lori confirmed that she confronted Michael on April 15, 2010 as to whether he lied about visiting a partner. She stated, and documentation corroborated, that Michael had cancelled a 1:1 they were scheduled to have on April 14, 2010 in order to make an emergency partner visit and that she was later informed by the partner that Michael did not meet with them.

Lori confirmed that she raised a concern to Michael regarding his treatment of her on August 3, 2010. She stated, and witnesses corroborated, that Michael was loud and disrespectful during a conversation they had regarding Eddie's decision to omit Michael's attendance to a meeting between Robert Youngjohns and one of Michael's partners. Witness/Thompson and Witness/Bowman were working nearby and both stated that Michael was "very loud" and "unprofessional" towards Lori during that discussion.

Lori confirmed that she had discussions with Michael in April 2010 regarding his request for vacation. She stated, and documentation corroborated, that she approved Michael's vacation but followed the guidance of her business leaders when requesting that Michael and her entire team limit their vacation in Q4 in order to focus on closing out the fiscal year.

No Positive Affirmations or Promotions

Michael stated that the subjects provided no positive affirmations or promotions. Some of the examples he provided included: the subjects failed to acknowledge any of the positive feedback he received from partners, the subjects failing to nominate him for awards, and the subjects failing to promote him.

Subjects stated, and documentation corroborated, that they did acknowledge the positive feedback he received from some partners and that Lori had nominated him for awards and team achievements when warranted by his performance. Subjects stated, and witnesses and documentation corroborated, that there were concerns regarding Michael's inconsistency in performance, and his ability and willingness to exhibit competencies necessary to promote him to next level. Lori, as well as other subjects, have promoted both male and female employees.

Witness/Both was Michael's skip-level manager in FY08/FY09 and Michael identified her as his primary "supporter" and advocate at Microsoft. Witness/both recalled a couple conversations they had regarding Michael's desire to be promoted but that he struggled to exhibit competencies and desire to up-level from L63 when she was his skip-level manager. She stated that Michael was a difficult employee to manage and non-receptive to feedback, that Michael would often disappear on his accounts, and that Michael would not follow through on stretch assignments.

MS37862

## Marginalization

Michael alleged that the subjects have marginalized him within US OEM and with his partners. Some of the examples he cited included: Lori failing to conduct regular 1:1s with him; Subjects cutting him out of emails and a meeting with Robert Youngjohns related to a partner; Lori and David denying his attendance at WPC; and Lori cutting his T & E budget in FY10.

The subjects denied marginalizing Michael. Regarding the specific examples above that Michael identified, subjects, witnesses and documentary evidence indicated the following:

Lori confirmed that she and Michael did not have regular 1:1s scheduled on their calendars. She stated, and witnesses and documentation corroborated, that she and Michael had a close working relationship in the Austin office and that the two of them would meet for 1:1s to discuss Michael's business often on an ad hoc basis or at lunch.

Subjects stated, and witnesses and documentation corroborated, that Michael has not been included on some communication with his partner, Motion Computing. Subjects explained, and witnesses and documentation corroborated, that this was due to (1) the fact that Lori is leading the US OEM's high-level Apple Compete Strategy that involves Motion, as well as other Microsoft partners not assigned to Michael and (2) the fact that Michael was on vacation for much of June/July 2010 when this Apple Compete Strategy "heated up" and required communication with Motion. Subjects also stated, and documentation and witnesses corroborated, the meeting between Robert Youngjohns and the CEO of Motion was focused on the Apple Compete Strategy and that Robert prefers smaller meetings.

Lori and David stated, and documentation corroborated, that Michael initially communicated to them that he would not be attending WPC because of low partner attendance. They stated, and documentation corroborated, that Michael ultimately could not attend WPC because it conflicted with the only available dates that he could attend in-person BPOS training (due to his vacation schedule in July 2010.) Lori stated, and documentation corroborated, that she did not cut Michael's T & E budget in FY10.

## Derogatory Comments

Michael alleged that at an offsite Eddie stated "I'll get my friends in the IRA to blow up France." He stated that the commented offended him because his mother's name is French. Eddie denied the comment and no witnesses present at the offsite, including the HRBP (Witness/Shields), corroborated it.

Michael also alleged that Eddie sent an organization-wide email titled "2 Females Promoted to Director". He stated that email offended him because Eddie's organization does not designate when men are promoted. Eddie confirmed the email and noted that he received coaching after sending it that such email announcements should be more balanced. Further, the organization has announced other promotions of individuals by name via email. the email could be hurtful to both men and women in his organization.

## Analysis and Conclusion

The investigation did not reveal sufficient evidence supporting Michael's allegation of discrimination by the subjects because of his gender or national origin. First, Michael provided no corroborating witnesses or evidence that the treatment he received from subjects was related to either his gender or national origin. Second, there was a legitimate basis for the subjects' management of Michael in terms of career discussions, coaching and feedback on corroborated deficiencies in performance. Third, many of the items identified by Michael as discrimination were legitimate business/management decisions made by the subjects that he simply disagreed with. Fourth, many of the examples of unfair treatment by the subjects cited by Michael were contradicted by the interviews and documentary evidence. Finally, Michael had previously identified Tracy Rummel's allegations in November 2009 against him as the catalyst for his treatment by the subjects and it was not until he was notified of the ERIT investigation in May 2010 that he raised his allegations of discrimination.[6]

Based on the foregoing, I find that the evidence does not support Michael's allegation that his gender or national origin was/is a factor in the subjects' treatment of him. Accordingly, I did not find that the subjects' treatment of Michael violated Microsoft's Anti-Harassment and Anti-Discrimination Policy.

### Allegation: Retaliation under Microsoft's Anti-Harassment & Anti-Discrimination Policy -Unsupported

Michael also alleged that Lori, David Tannenbaum, and Eddie O'Brien had retaliated against him for raising a discrimination allegation against them and for participating in this ERIT investigation. In support of this allegation, Michael cited the following:

- Feedback in FY10 Review
- Rewards in FY10 Review

Feedback in FY10 Review:

Michael alleged that the subjects had retaliated against him by highlighting only "critical/negative" feedback in his review that was not substantiated and never raised in 1:1s or in MYCD. An example of this was the feedback that "I 'held hostage' my colleagues to achieve my objectives.

Subjects denied that they retaliated against Michael in regards to his FY10 feedback. Lori stated, and witnesses and documentation corroborated, that Michael's FY10 written review included both positive and constructive feedback obtained throughout the year and via the Performance@Microsoft tool. Lori stated, and witnesses and documentation corroborated, that Michael did receive feedback from Witness/Pisan and his team that included the term "held hostage" when discussing their feedback on Michael.

Rewards in FY10 Review

---

[6] The investigation did not reveal evidence supporting the allegation that subjects treated him unfairly and/or treated him unfairly because of Tracy Rummel's allegations.

Michael alleged that the subjects retaliated against him by awarding him a CBI bonus and Stock grant that were a 69-70% reduction of what he received in FY09 despite the fact that he reached his quota and had the same rating (Achieved/70%). Michael highlighted that a colleague reporting to Lori, Michael Warren, was awarded equivalent or higher CBI/Stock awards despite having missed his quota.

Subjects denied that they retaliated against Michael in regards to his FY10 rewards. Regarding CBI, subjects stated, and witnesses and documentation corroborated, that there were additional factors weighed besides quota attainment that went into the assessment of PAMs in David's organization and Michael scored the lowest of all PAMs in David's organization. Subjects stated, and documentation corroborated, that there were significant issues related to Michael Warren's business that resulted in adjustment of his quota attainment to 99% and Michael Warren did better than Michael in other factors weighed by subjects when assessing PAMs in David's organization. Regarding Stock award, subjects stated, and witnesses and documentation corroborated, that Michael's length of time in role, corroborated deficiencies, and documented concerns around the UPC project were considered when assessing his contribution ranking at bottom 70% on contribution - thereby resulting in lower stock award.

Analysis and Conclusion

The investigation did not reveal sufficient evidence supporting Michael's allegation of retaliation by subjects. First, the feedback used in his review was substantiated by witnesses and statements within the Performance@Microsoft tool and the issues around the "held hostage" comment was verbatim feedback that had first been raised in early January 2010 with Michael. Second, Michael's CBI and Stock award are supported by witnesses and documentary evidence based upon his achievements against his commitments for FY10 and contribution ranking for FY10.

MS37865

# Tab N

**Email string from M. Mercieca to G. Houston, dated May 5, 2010
(19RR:MSFT297)**

To:       Gwen Houston[gwenh@microsoft.com]
Cc:       Michael Mercieca[michmer@microsoft.com]
From:     Michael Mercieca
Sent:     Wed 5/5/2010 3:55:43 PM
Importance:   Normal
Sensitivity:  None
Subject:      RE: Two Female Promotions to Director in USOEM!

image002.jpg
image004.png

G'Day Gwen,

I reflected on our conversation of yesterday evening for quite a while. I
wanted to thank you for your empathy regarding this delicate, but
nonetheless important issue. I thoroughly enjoyed listening to your
perspectives on diversity, which overlap mine in many ways. With my own very
diverse background, combined with the experiences I have been fortunate to
have in working around the world; I have grown accustomed to enjoying the
value of diversity and growing as a result. My own personal quote for
diversity is "The difference is in the difference".

There is extraordinary value in different perspectives and styles. Your
comments on diverse "styles" was very comforting to me. I have felt for some
time that diversity within Microsoft is governed by major groups such as:
gender; sexual orientation; race etc.

Whilst those are extremely important, I believe your comments around "style"
are crucial. Our diversity is somewhat like an iceberg. 90% - our values;
customs; etc. lay beneath the surface. They manifest themselves in our style
- the 10% above the waterline. We must truly work to understand individuals
90% to understand the manifestation of the 10% - the style and what we see
and hear.

Getting to know the 90% is hard work - nevertheless, it is time well spent
as we then have deep, almost DNA like understanding of people and how we can
get the best from each other.

I appreciate your reaching back to me and the time you invested in our
discussion.

Good luck in your upcoming presentation - also if you ever need a
perspective/ speaker on this subject; I am only too happy to offer my time.

Exhibit

MSFT 297

Regards

Michael

Michael Mercieca

Microsoft US Partner Group – South Central OEM Team

michmer@microsoft.com <mailto:imichmer@microsoft.com>

512-795-5366 wk

512-795-5301 fax

512-779-8648 mb

Description: Win7 Signature

<http://www.bing.com/> Description: cid:image001.png@01C9E9D8.8C022B90l
bing .... so go bing

From: Michael Mercieca
Sent: Tuesday, May 04, 2010 7:24 PM
To: Gwen Houston
Subject: FW: Two Female Promotions to Director in USOEM!

fyi

From: Eddie O'Brien
Sent: Monday, May 03, 2010 2:32 PM
To: US OEM
Cc: Lauren Gardner; Robert Youngjohns; Micky Shields; John Case
Subject: Two Female Promotions to Director in USOEM!

FY10 has been an exciting time to be in OEM. We are executing well, capitalizing on the growth in the PC market and the launch of Win 7 thus making outstanding traction on attach and revenue while making very strong progress on CPE & OHI.

US OEM is driving hard to build on the Windows 7 momentum to drive share and premium mix as part of our overall compete strategy against Apple, Google and Linux. Some of our key objectives are 1) to land Windows on all PCs and new form factors; 2) capture the Corporate refresh opportunity; 3) Land Professional on business PCs; 4) Land Windows 7 Starter on Netbooks; 5) Ensure Office 2010 Starter image is on all PCs and 6) Land Windows Live Wave 4 and Bing are on as many PCs as possible and 7) continue to grow Server Attach.

Two roles that are critical to achieving these goals are 1) how we Operate Sales and manage the Business overall to drive attach and 2) how we engage with our Verticals and Named Accounts. In light of this I am very pleased to announce the promotions of Lori Aulds to Director Named and Vertical and Jeannine Borgen to Director Sales Operations and Business Management to assist in driving these key efforts.

Lori has played a critical role in enabling the team to drive 182% of budget and 17% YoY growth in our Named Business as Group Manager for the West Region. Lori leads our engagement to WWOEM Named Team and is key contributor to WW projects like LINC & LEAP. As Director for the Named & Vertical she will deepen her focus in this critical part of the business to drive longer term growth into the Named Business. Since joining the OEM team in FY08, Lori has made a significant contribution first as Sales Manager, then Group Manager and I know this will continue as Director. Lori will continue to report to David Tannenbaum, Director for US Local OEM Sales, as he will continue with his responsibilities for the all up Named and System Builder sales in the US.

Before joining us, Jeannine worked in PCMIT where she oversaw the PC market and attach trends for 78 subsidiaries and integrated analysis on MNA, Netbook, Apple and UPC into the forecast while managing five direct reports. In addition to managing negotiations and discussions with 78 subsidiary GMs and several regional VPs, she reported and defended results out to a variety of executive stakeholders including from Client, Server and IW BGs, OEM, Corporate Strategy and Investor Relations. In her current role, she has ramped quickly and has been a key liaison to working with her former team in properly setting the market and attach trends and communicating out those trends to the various stakeholders. Jeannine's unique work experience lends itself to helping through cross-group and cross-team collaboration to facilitate a more streamlined process and continued focus on attach through sales operations and Business Management. Jeannine will continue to report directly to me.

Please join me in congratulating Lorl and Jeannine on their promotions to
Directorlt

Thanks

Eddie

Eddie O'Brien

Vice President US OEM

Microsoft Corporation

eddieob@microsoft.com

Desk: + 1 425 7056447

Cell: + 1 425 7856788

MS00594